**STATE of Tennessee, Appellee,**

v.

**Ronnie MARSHALL, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

June 30, 1992.

Permission to Appeal Denied by Supreme Court Nov. 30, 1992.

Charles W. Burson, Atty. Gen. & Reporter, Kathy M. Principe, Asst. Atty. Gen., Nashville, Lawrence Ray Whitley, Dist. Atty. Gen., and Jerry R. Kitchen, Asst. Dist. Atty. Gen., Gallatin, for appellee.

Mark J. Fishburn, Nashville, for appellant.

## OPINION

JONES, Judge.

The appellant, Ronnie Marshall, was convicted of murder in the first degree by a jury of his peers. He was sentenced to life in the Department of Correction.

The appellant contends that his constitutional rights to due process of law and a fair trial were violated because the State of Tennessee failed to furnish him exculpatory evidence within the meaning of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He further contends that the trial court committed error of prejudicial dimensions in failing to require the State to present the statements of certain individuals interviewed by the Sumner County Sheriff's Department for an *in camera* inspection to determine if the statements contained exculpatory evidence; and the trial court further erred by failing to compel the State to furnish him with this information.

The judgment of the trial court is reversed; and this cause is remanded to the trial court for a new trial. This Court is of the opinion and finds that the State of Tennessee deprived the appellant of due process of law by failing to furnish the appellant with exculpatory evidence, which was in its possession.

### I.

On the morning of February 21, 1989, the body of Lonnie Malone was found in a concrete culvert by a Sumner County Highway Department employee. The body was found near Bug Hollow Road. The cause of death was the excessive loss of blood. There were six stab wounds to the body. Most of the wounds were classified as defensive. The fatal wounds were stab wounds to the chest and neck, which severed an artery.

After Malone's body was discovered, Robert Spurlock and Ronnie Marshall became suspects. The Sumner County Sheriff's Department began searching for Marshall. The investigating officers discovered that he was in Florida. When Marshall eventually called Gallatin, he learned that he was a suspect, and the authorities were trying to locate him. He returned to Gallatin on February 22, 1989.

The State's theory was that Marshall and Malone sold drugs for Robert Spurlock. Malone had failed to pay for the drugs that Spurlock furnished him. When Malone failed to pay Spurlock, he, Spurlock, decid-

ed to kill him. According to the State, Marshall aided and abetted Spurlock in killing Malone. Marshall supposedly found Malone, delivered him to Spurlock, and was present when Spurlock killed Malone.

Marshall testified in support of his defense. He denied looking for Malone and making him available to Spurlock; and he further denied that he was with Spurlock when he, Spurlock, killed Malone. He testified that he learned about Malone's death when he called a friend and his sister from Fort Walton Beach.

## II.

The Sumner County Sheriff's Department conducted a thorough investigation of Lonnie Malone's murder. Several witnesses were interviewed. Some of these witnesses identified Robert Thomas "Astro" Coats as the person who either killed Malone or participated in the murder. Coats admitted that he killed Malone to a few of the witnesses.

Coats left Gallatin and went to Florida with Mary Skinner. Thomas Wayne Dyer, Mary Skinner's son, was living in Florida. Coats told Dyer:

"Astro" stated that he had killed a guy name "Shitty." [Malone's nickname] "Astro" stated that he cut his throat and left him in the hollow. Coats told Dyer that this fellow owed him some money and he did not have it. Coats told Dyer that he picked up [Malone] and they went riding and were doing drugs and they went to Bug Hollow Road. They got out of the car to use the bathroom and Coats says that he stabbed [Malone]. Coats said there was blood all over his car and he had to clean it up. Dyer also states that Coats showed him the knife that he said he killed [Malone] with. It was a lock blade type knife. Also Dyer says that Coats told him not to say anything to anyone about what he said.

Dyer was interviewed by the Sumner County Sheriff's Department on May 9, 1989.

Mary Skinner was Coats' girlfriend. She was interviewed by the sheriff's department on May 15, 1989. In her statement she said that Coats and Joe Neal Bohannon would go to the north side of Gallatin and "cop" dope. She further related that Coats "would carry an ounce or half ounce of pot to the north side and go back a while later and pick up his money or parts of it." On one occasion Coats told Skinner that "a black guy owed him some money, but would never say who or how much." When Coats decided to leave Gallatin, he told Skinner "he was afraid there were some sealed indictments on him coming from the grand jury for selling pot and cocaine." Coats abandoned a truck, which he left on the side of a roadway, and his furniture in his haste to leave Gallatin.

Coats told Skinner that he had talked to someone in Gallatin and learned that a friend had been interviewed by the sheriff's department; and "there were warrants on him for the murder of [Malone]." He also told her: "You know you are my alibi on the murder deal." When asked if Coats was capable of murdering a person, she told the officer, "Hell, yes. He would do anything if the price was right." She also told the officer that "she would not put anything past him [Coats] and Joe Neal [Bohannon] if they got messed up on cocaine."

Elizabeth Burba was interviewed by the Sumner County Sheriff's Department on April 12, 1989. She told officers that during the first part of March, 1989, Coats told her that "he 'cut a mother fucker's neck,' then he said he threw him in the culvert." When she inquired further, he told her that "he [the victim] owed him some money for cocaine and that he had been trying to avoid him." He answered in the affirmative when she asked if the person he cut was Malone. She then told Coats that she did not want to know any more about the occurrence.

Christy Angela was interviewed on April 24, 1989. She was told by William Clariday that "a friend of his ... was involved in the Malone killing." He gave a physical description of Coats. She also related a conversation with Andrina Barksdale.

Andrina Barksdale was interviewed on April 20, 1989. She related a conversation

with Charles Anthony "Boo" Crenshaw two days following the killing. Crenshaw told her:

Ronnie Marshall picked Lonnie up in Nikka Bennett's car at an unknown location and took Lonnie to meet Spurlock. Spurlock and two (2) other white males got into the car with Marshall and Lonnie, with Lonnie being in the middle of the back seat with the two (2) white males and Marshall and Spurlock riding in the front. Lonnie was taken to a house on a dirt road at the foot of Hwy 109 ridge and killed. Crenshaw talked like it was not intentional for Lonnie to be killed. Spurlock and Marshall watched while the other two (2) white males killed Lonnie with a crowbar (tire tool). Prior to Lonnie being killed, Spurlock gave Ronnie Marshall the choice of either Marshall or Lonnie being killed because Marshall and Lonnie both owed Spurlock money.... Marshall took off to Florida in Nikka Bennett's car and Spurlock sent two (2) dudes to Florida after Marshall. Marshall did not stay long in Florida.

Coats was interviewed on May 19, 1989. He denied knowing the victim and denied telling anyone that he killed the victim. He told the deputy sheriff that "he told Mary Skinner that she was with him and that she knew she was with him at Coats' house in Buttermilk Hollow the night Malone was killed."

Statements were also taken that named the "Bandys" as the individuals who killed Malone. Supposedly, Marshall and Malone also sold cocaine furnished by the Bandys and both were heavily in debt to the Bandys.

Kenny Driver was interviewed on March 2, 1989. Earlier that day he had spoken to an unidentified female who told him that "one of the Bandys, ... picked up Lonnie's brother-in-law, rode around and picked up Lonnie [Malone] and carried him to Bug Hollow Road where the rest of the gang was waiting. They killed Lonnie right there in front of Ronnie [Marshall] to make an example out of him to Ronnie—'that's what happens when you don't pay you[r] money.'" According to Driver, the Bandys were "fronting" cocaine to Malone; and Malone owed the Bandys more than he owed Spurlock.

James Edward Brinkley was interviewed on February 28, 1989. He stated that he saw Marshall with a woman driving a blue Cordoba on Blakemore Street "about 9:00 or 10:00 P.M." on February 20, 1989. He also saw Marshall an hour later. He too made reference to the Bandys.

### III.

The appellant filed a pre-trial motion seeking discovery pursuant to Rule 16, Tenn.R.Crim.P., and exculpatory evidence in the possession of the State or a state governmental agency. The motion listed twelve categories of exculpatory evidence that the appellant sought from the State. The trial court subsequently entered an order granting the motion. The order recited:

Upon motion and requests made by the defendant before the Court for Discovery and Inspection, as provided by the [Tennessee] Rules of Criminal Procedure, and *there being no objection from the State* and, in fact, *agreed upon by the State*, IT IS ORDERED by the Court that said Motion and/or requests are granted. [Emphasis added].

Later, the State filed a written response to the appellant's motion. The response stated in part: "There is no exculpatory or mitigating evidence known to the State at this time."

The appellant subsequently filed a motion for a continuance on the ground the State had failed to furnish him certain exculpatory evidence. The motion sought a statement given to the sheriff's department which allegedly stated that a witness saw the victim in a motor vehicle with two white men shortly before the victim was murdered; and the appellant was not with the two men. The motion also sought to inspect a knife that sheriff deputies described to several witnesses as the murder weapon. The appellant's brother was supposedly the owner of the knife. Finally, the appellant sought to inspect the victim's watch. The watch supposedly stopped

shortly before 10:00 P.M. on the night in question; and, according to the appellant, the State would theorize that this indicated the hour the victim was murdered.

Shortly after the case was continued, the appellant filed a motion to compel the State to furnish him with certain specified exculpatory evidence. First, the appellant sought statements made by Priscilla Blakemore, which tended to establish that the appellant was with her at or about the time the victim was murdered. Second, he sought the statements of Henry Apple, Jr., who he believed would clearly establish that the appellant "took no active part in the actual murder" and the victim's death "may have resulted from wounds which were provoked by the victim." According to the appellant, these statements could have established the defense of self-defense. Third, he sought statements or other evidence which suggested that "other persons were present at the time of the murder other than the Defendant and Mr. Spurlock, particularly information which tend[ed] to establish the presence of an unknown white male and/or Donnell Marshall." Fourth, he sought evidence which tended to establish that the appellant was not present when the victim was murdered.

The trial court in substance denied the motion. The court ruled that the appellant was not entitled to the statements of Priscilla Blakemore. The court also ruled that the appellant was not entitled to the statements of Apple or other witnesses which suggested that an unknown white male and/or the appellant's brother murdered the victim; but the court said the ruling was subject to change after the court had reviewed the statements *in camera*. Finally, the trial court ruled that the appellant was not entitled to any evidence which established that he was not present when the victim was murdered.

The record does not reflect whether the trial court reviewed the statements *in camera*. However, on December 10, 1990, the District Attorney General filed a sealed envelope containing the statements of witnesses interviewed by the Sumner County Sheriff's Department who did not testify at the trial. The letter inside the sealed envelope stated in part that the statements were being filed pursuant to "Judge Kelly's order during the hearing on the defendant's motion for a new trial in this case." The envelope was authenticated as an exhibit by the trial court. The stamped portion states: "Authenticated and made a part of the record this 26th day of March, 1991." It was signed by the trial court. This envelope was filed with the record on April 11, 1991.

## IV.

■ In the landmark case of *Brady v. Maryland, supra,* the United States Supreme Court ruled that the prosecution has a compelling duty to voluntarily furnish the accused upon request any exculpatory evidence that pertains to (a) the guilt or innocence of the accused and/or (b) the punishment which may be imposed if the accused is convicted of a criminal offense. The Court said in *Brady* that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–1197, 10 L.Ed.2d at 219. Thus, three prerequisites must be present before the prosecution is required to furnish the accused with "exculpatory evidence." First, the evidence must be material. Second, the evidence must be favorable to the accused, his defense, or the sentence that will be imposed if found guilty. Third, the accused must make a proper request for the production of the evidence unless the evidence, when viewed by the prosecution, is obviously exculpatory in nature and will be helpful to the accused. *See United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Aqurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland, supra; Strouth v. State,* 755 S.W.2d 819, 828 (Tenn.Crim.App. 1986).

■ The prosecution's duty to disclose is not limited in scope to "competent evidence" or "admissible evidence." The duty

extends to "favorable information" unknown to the accused. *United States v. Gleason,* 265 F.Supp. 880, 886 (S.D.N.Y. 1967). In *Branch v. State,* 4 Tenn.Crim. App. 164, 469 S.W.2d 533 (1969), the accused contended that the victim had a knife, chased him from a cafe, and the accused shot the victim in self-defense. A citizen found a knife in the area where the killing occurred and gave it to law enforcement officers. The prosecution did not reveal the discovery of the knife to the accused. In reversing the accused's conviction, this Court said:

> That information could very well have enabled defense counsel to conduct further and possibly fruitful investigation regarding the finding of the knife. The mere fact that the police did not get the name of the person who delivered the knife to them could not in any way affect the duty of the Assistant District Attorney General to inform the defendant or his counsel of the fact.

> It is, therefore, no answer to say, as the State insists and as the Assistant District Attorney General argued before the trial court, that the State's information about the knife turned in to the police department was hearsay and inadmissible in evidence on that account.

>     \*    \*    \*    \*    \*    \*

> The nondisclosure and suppression of evidence or information favorable to the defense, or which might be useful to the defense, even though there is no showing of the prosecution's bad faith, offends those fundamental constitutional concepts of a fair trial so essential to due process of law.

4 Tenn.Crim.App. at 168, 173, 469 S.W.2d at 534, 536.

In the context of this case, the prosecution had a duty to disclose the names and addresses of witnesses who could exonerate the accused, corroborate the accused's position in asserting his innocence, or possessed favorable information that would have enabled defense counsel to conduct further and possibly fruitful investigation regarding the fact that someone other than the appellant killed the victim. *See*

*Jones v. Jago,* 575 F.2d 1164, 1168–1169 (6th Cir.), *cert. denied,* 439 U.S. 883, 99 S.Ct. 223, 58 L.Ed.2d 196 (1978); *Banks v. Georgia,* 235 Ga. 121, 218 S.E.2d 851, 854 (1975), *cert. denied,* 430 U.S. 975, 97 S.Ct. 1667, 52 L.Ed.2d 370 (1977). The prosecution also had a duty to disclose the statements of witnesses that were exculpatory or favorable to the accused. *State v. Goodman,* 643 S.W.2d 375, 379–380 (Tenn. Crim.App.1982). In *Goodman,* this Court held that the prosecution had a duty to disclose a statement which implied in part that the accused did not murder the deceased.

The prosecution is not required to disclose information that the accused already possesses or is able to obtain, *State v. Caldwell,* 656 S.W.2d 894, 897 (Tenn. Crim.App.1983); *Banks v. State,* 556 S.W.2d 88, 90 (Tenn.Crim.App.1977), or information which is not possessed by or under the control of the prosecution or another governmental agency. *Banks v. State, supra.* Nor is the prosecution required to seek out exculpatory evidence not already in its possession or in the possession of a governmental agency. *See United States v. Xheka,* 704 F.2d 974, 982 (7th Cir.1983), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983) ("the Government is under no duty to seek out witnesses"). When exculpatory evidence is equally available to the prosecution and the accused, the accused "must bear the responsibility of [his] failure to seek its discovery." *United States v. McKenzie,* 768 F.2d 602, 608 (5th Cir.1985), *cert. denied,* 474 U.S. 1086, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986) (video tape in the hands of a private lawyer representing a witness held equally available to both parties).

## V.

The information contained in the statements hereinabove set forth was clearly material as it related to the very issue the jury was required to decide, *i.e.* who killed Lonnie Malone. The information was also favorable to the appellant. Had defense counsel been aware of the information contained in the statements, he could

have investigated the possibility that either Coats or the Bandy family killed Lonnie Malone. Counsel could have asserted the defense that another person killed Malone, provided counsel was able to develop admissible evidence to establish this defense. One of the witnesses provided an alibi for the period of time the murder was alleged to have occurred. However, this evidence would have been cumulative since a witness testified that he saw the appellant during this same time span. Finally, the appellant made several written requests for the information contained in the statements. The record is replete with such requests. In addition, an order was entered which required the State to furnish this information to the appellant or his counsel.

The failure of the State of Tennessee to furnish the appellant with the statements hereinabove set forth violated the appellant's constitutional right to due process of law, which is guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution.

■ While this error is subject to harmless error analysis, *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *State v. Hartman*, 703 S.W.2d 106, 114–115 (Tenn.1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3308, 92 L.Ed.2d 721 (1986), this Court is of the opinion that the error cannot be deemed to be harmless beyond a reasonable doubt. There was a reasonable probability that the results of the trial would have been different had the exculpatory evidence been disclosed to the appellant. *United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 2282, 87 L.Ed.2d at 494.

BYERS, P.J., and BIRCH, J., concur.