# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 27, 2010 Session

## DOUGLAS JORDAN v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Blount County**
**No. C-16218     David R. Duggan, Judge**

---

**No. E2009-01116-CCA-R3-PC - Filed January 25, 2011**

---

A Blount County jury convicted the petitioner, Douglas Jordan, of second degree murder. The trial court sentenced the petitioner to twenty-three years in the Tennessee Department of Correction. On direct appeal, this court affirmed his conviction and sentence. The petitioner sought post-conviction relief, and the post-conviction court found that the state suppressed evidence but that the evidence was not material to the defense. On appeal, the petitioner argues that (1) the state withheld favorable, material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) the post-conviction court erred by applying a sufficiency of the evidence standard to the materiality prong of the *Brady* test; (3) the state's suppression of evidence violated Article 1, sections 1 and 2, of the Tennessee Constitution; and (4) in the alternative, the petitioner's trial counsel provided ineffective assistance by failing to properly investigate the case. Following our thorough review, we conclude that the state failed to disclose evidence that was both favorable and material to the defense in violation of the petitioner's right to due process. Therefore, we reverse the judgment of the post-conviction court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

J.C. MCLIN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J. and JAMES CURWOOD WITT, JR., J., joined.

Gina Lewis, Knoxville, Tennessee, for the appellant, Douglas Jordan.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Michael L. Flynn, District Attorney General, and Rocky H. Young, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Background

*Trial*

In October 2002, a trial jury found the petitioner, Douglas Jordan, guilty of the second degree murder of Jennifer Byerley. The trial court sentenced him to twenty-three years in the Tennessee Department of Correction. In the petitioner's direct appeal, this court summarized the facts of the case as follows:

> On March 11, 1998, the victim, Jennifer Byerley, who was deaf and mute, was at the End Zone bar on Alcoa Highway near the Knoxville airport. An employee at the bar, Mary Roberts, who was a neighbor to the victim, saw that the victim had been "talking to the Mexicans," who frequented the bar, and, because she felt the men were acting "inappropriate[ly]" toward the victim, she asked them to leave. The victim, who was crying, stayed in a booth. The [petitioner], whom Ms. Roberts had seen in the bar several times previously, asked about the victim and then obtained a paper and pencil (so as to be able to communicate) before going to sit with her in the booth. Ms. Roberts saw the two pass notes before the [petitioner] stood, wadded the paper, threw it in a trash can, and remarked, "[H]ow in the hell did I get my [self] into this sh*t[?]" Ms. Roberts recalled that the [petitioner], who at that time had no physical blemishes other than a "place" on his nose, then went to the restroom. It was her recollection that the [petitioner] left the bar through a back door at about 11:30 p.m. and the victim left later through the front door. Ms. Roberts remembered that when she saw the [petitioner] the next day, he had "a lot of scratches" down the side of his face.

> At approximately 6:30 a.m. on March 12, the body of the victim was discovered in a curve along the side of Wheeler Road in Blount County about 1.2 miles from the End Zone and less than ½ mile from the victim's apartment. The victim was on her back. One leg was crooked and one arm of her jacket was pulled over her head and face. Her throat was cut. There was blood on the victim's jacket and frost on the sleeve. The victim was wearing three rings.

> At trial, Ms. Roberts acknowledged that during the two years the victim had been a patron of the End Zone, she had "pretty much exclusively . . . hung around Mexicans." Although she initially denied having prevented the victim from leaving with "the Mexicans" on the night of her death, Ms. Roberts

acknowledged having told police she had done so. She also admitted having told police that "the Mexicans" left the bar at 11:30 p.m., only minutes before the [petitioner] had departed. Finally, she also admitted that during her statement to police, which was provided before she saw the [petitioner] on the day the body was discovered, she described his physical appearance as follows: "He's got light brown hair and he's just been in a wreck so he's got a scar on his nose and skinned-you know, skinned up all over. He just had a wreck, like last week."

Earl Horton, a bartender at the End Zone who knew the victim and the [petitioner] as patrons of the bar, testified that sometime between midnight and 1:00 a.m., the victim and the [petitioner] "had a discussion" after which the [petitioner] left quickly through the back door and the victim seemed upset. He testified that when the victim left through the front door, he followed her outside and asked whether she was "okay." Because he was concerned for her safety, he walked to the edge of the building to watch her progress. He saw that the [petitioner] was waiting outside of the building and when the victim walked up to him, Horton asked if they were "okay." The [petitioner] replied, "[Y]es, we're fine." The victim nodded her head affirmatively and the two walked away in the direction of the motel next door. When Horton saw the [petitioner] two days later, he noticed some scratches on the left side of his face and hands that he had not seen before. After being asked about the scratches, the [petitioner] explained that he had scratched himself because of a skin condition.

Martha Gaston, who worked at The Laundry Place on Chapman Highway in Knoxville, testified that at approximately 3:00 p.m. on the afternoon after the murder, the [petitioner] brought some laundry in to be washed. He offered to pay extra for same-day pick-up and she agreed. Ms. Gaston recalled that the [petitioner] "looked sweaty" and that he explained that he had "had an accident." She remembered that the [petitioner] pointed out blood on the sheets and that she thought it was unusual because it was "red and deep," as opposed to menstrual blood. Although she used bleach on the sheets, Ms. Gaston was unable to remove the blood stains. She testified that the [petitioner] picked up his laundry between 5:00 and 6:00 p.m.

Blount County Sheriff's Department Detective Scott Carpenter, who executed a search warrant at the victim's apartment, found no signs of any struggle. Officers also searched the [petitioner]'s residence, a second-floor motel room at the Airport Inn, and found a crumpled note in the garbage can

under the sink. According to Detective Carpenter, you could "throw a rock from the back of the End Zone and hit the Airport Inn." He testified that while officers also seized bloody sheets, subsequent testing established the blood was that of the [petitioner]. In an interview by Detective Carpenter on the day after the murder, the [petitioner], who is right-handed, stated that he met the victim four or five nights earlier while playing pool at the End Zone. He explained to the officer that because the victim was deaf and mute, they communicated by writing notes and that the victim asked for his address after their initial meeting and visited his residence later that night. According to the [petitioner], they communicated in writing for about thirty minutes and he drove her home. He stated that on the evening of the murder, he spent most of his time at the bar with a woman named Robin but that later, while he was shooting pool, Mary Roberts asked for someone to help the victim "because . . . people [were] taking advantage of her." He told the officer that in response to the request, he had discouraged the victim from leaving the bar with another man and that after "all of her Mexican friends" had gone, she declined his offer of a ride home. The [petitioner] claimed to the officer that the victim left first and that he finished his beer before leaving through the back door. He initially maintained that the occasion was the last time he had seen the victim but, later, when confronted with a note police had found in his trash can, he admitted that the victim had been in his room that night, contending that she had waited outside the End Zone and followed him home. The [petitioner] explained that he had initially lied to the officer because he was nervous. He insisted that because he was interested only in sex and had refused a romantic relationship with the victim, she left his residence after approximately fifteen minutes. The note, which the [petitioner] helped the officer read, provided as follows:

> [Victim] I'm so sorry[.] I not mean[ ]. I'm so drunk.

> [Petitioner] You make me look like a fool and me want nothing to do with you[.] I want you to go home. I told you I did not want you for g[ir]lfriend and that's what I meant[.] I just want to be free and have fun [*period.*] If the[re] were any chance of us you just ruined it. Do you want me to take you home[?]

> [Victim] Can I stay with you tonight? Did you stop by my house . . . after you[r] work?

> [Petitioner] *No!* I did not stop by your house.

-4-

[Victim] Do you want me to go home?

[Petitioner] Yes [and] no[.] I don't want you to be close to me!!!!!!! I do not want you as girlfriend[.] Just for fun! Do you want to go home or do you want to stay here and f* *k[?]

When questioned about blood that was found around his bathroom sink, the [petitioner] told the officer that he had been injured in a car accident five days earlier. He denied having had sex with the victim and denied having killed her. He agreed to provide police with blood and hair samples and consented to have his car impounded for examination. When asked to account for his time since the murder, the [petitioner] reported to the officer that he had performed a variety of personal errands, which included taking his laundry to The Laundry Place on Chapman Highway.

In an interview five days later on March 17, the [petitioner] acknowledged that he was angry with the victim on the night of the murder because they "had to have the same conversation again" and "she couldn't take no for an answer." He denied, however, that he had been angry enough to kill the victim and further denied having hit her or harmed her in any way. When asked about the blood on his sheets, the [petitioner] explained that he had a skin condition that caused him to become injured and bleed easily. In a final interview on August 27, the [petitioner] continued to deny having had any physical contact with the victim, even when the officer falsely advised him that the victim's blood had been identified on his sheets. He insisted that the DNA results were error, stating, "Something ain't right. . . . They's got to be something somewhere somebody ain't seeing." The [petitioner] asked the officer, "Ain't they something else you all can do to check further than you have? I know that it might cost the taxpayers a lot of money but I pay my taxes too." During cross-examination, Detective Carpenter acknowledged that the [petitioner] cooperated fully with the police in their investigation.

There were stipulations of fact:

1. [The [petitioner]'s] blood was on the side of his motor vehicle ... [and] was found on the console inside of the same vehicle; no other person's blood was found in or on the vehicle.

2. [The [petitioner]'s] and [the victim's] blood [were] found mixed on the right front of the [victim's] black corduroy overalls ... [and] on the rear tag on the inside of the [victim's] bra.

3. [The [petitioner]'s] blood was found on the sheets [seized by officers at the [petitioner]'s residence].

4. [The [petitioner]'s] blood was found on the note [seized by officers at the [petitioner]'s residence].

5. The [petitioner]'s DNA was found under the index and ring finger nail scrapings of [the victim's] right hand.

6. [The victim's] blood was found only on her person and the clothes she was wearing.

Deanna Jordan, who was married to the [petitioner]'s father at the time of the murder, testified that the [petitioner] arrived at their residence a day or two after the murder "noticeably on drugs." She described him as crying, unshaven, and appearing nervous. Ms. Jordan recalled that when he approached the back porch where she and her husband were sitting, the [petitioner] announced that "he had done something awful." She understood him to say that he had "shot up [illegal drugs] fourteen times that day." When Ms. Jordan asked him, "Is that how that happened," he replied in the affirmative. She then excused herself to make coffee while her husband and the [petitioner] spoke. During cross-examination, Ms. Jordan acknowledged that she did not hear the [petitioner] make any specific reference to killing the victim. The [petitioner]'s father died shortly after the victim's murder.

Megan Clement, the Technical Director of the Forensic Identity Testing Department of LabCorp, performed DNA testing on certain items of evidence. She testified that the victim's blood was not found on the [petitioner]'s sheets, but that when bleach is used, it can "degrade DNA and break it down to the point where it's undetectable." Ms. Clement related that she only tested scrapings from two of the five fingers on the victim's right hand, but recalled that the testing yielded a mixture of DNA consistent with the victim and the [petitioner]. She acknowledged that she was unable to identify the origin of the [petitioner]'s DNA as skin, blood, or saliva.

Dr. David M. Gilliam, who performed the autopsy, estimated that the victim had been dead for three to five hours when the body was found. He testified that although the victim's throat had been cut, the cause of death was manual strangulation. The victim also had blunt force injuries to the head and face and a non-lethal stab wound to the upper right abdomen which Dr. Gilliam believed, based on bleeding and bruising patterns, to have occurred prior to death. Dr. Gilliam characterized the victim's neck wound as "gaping" and described it as "consistent with someone being on top of, kneeling over, or sitting on top of the victim and cutting from the victim's right to left." It was his opinion that a right-handed person inflicted the neck injuries.

. . . .

Sandra Scott, who testified on behalf of the defense, recalled that two days before the murder, she had lunch with the [petitioner] and her best friend, Shawna Jordan, who was dating the [petitioner]. Ms. Scott contended that the [petitioner] "had scars all over his face and his nose and scars on his body." She recalled that when she asked what had happened, he answered that he had wrecked his car.

Carl Anderson, a life-long friend of the [petitioner], testified that he also saw the [petitioner] shortly after the car accident in March. Although he could not recall the date, Anderson claimed that he had arrived at the residence of the [petitioner]'s father just after a tow truck had unloaded the [petitioner]'s wrecked vehicle. He described the [petitioner] as "[c]ut up ... and scuffed up pretty bad."

Mike Michaels, the [petitioner]'s stepfather, testified that the [petitioner] telephoned him at approximately 4:30 a.m. on March 8 to request assistance after an automobile accident. He recalled that he picked the [petitioner] up at his residence at the Airport Inn and drove to the scene of the accident on Maloney Road. According to Michaels, the [petitioner] had lost control of his vehicle, gone over a twelve-foot embankment, and struck a tree. Michaels recalled that the [petitioner] had a number of cuts and bruises, including some on the face. He testified that he and the [petitioner]'s mother helped clean and dress the wounds, remembering that they "pulled glass out of [the [petitioner]'s] head for about an hour."

Sharon Monterrosol testified that she first met the victim at the residence of a friend the November prior to her murder. She recalled that the

victim, who was with her boyfriend, Marco Villo-Gomez, had a black eye. Ms. Monterrosol stated that at some point after Christmas 1997, some two months before the murder, she overheard Villo-Gomez say that he was going to kill "her." She acknowledged that he did not identify the victim by name and that he "had been drinking and ... was angry" at the time of the remark. Ms. Monterrosol testified that some time later, she again overheard Villo-Gomez, whom she described as "very drunk" and "very angry," say in Spanish that he was "going to kill the bitch." During cross-examination, she acknowledged that Villo-Gomez appeared to care about the victim and was "very protective" of her. Ms. Monterrosol stated that in March of 1998, Villo-Gomez lived in Morristown but would sometimes visit on weekends, staying with relatives in the victim's apartment complex. She testified that he was left-handed.

David Cockrill, the victim's next door neighbor at the time of her death, testified that the victim "would come over and knock on [his] door from time to time and hand [him] notes wanting to borrow money" but that, otherwise, she generally frequented with "the Mexicans," who lived in the apartment complex. He stated that the victim was unemployed and received a Social Security disability check every month but that she would often use her money to purchase beer and cigarettes for the Mexicans. According to Cockrill, he last saw the victim on the morning prior to her death when they were leaving their respective apartments. He recalled that he went to bed at about 11:15 that evening before being awakened at approximately 3:00 a.m. by a "disturbance" at the victim's apartment. Cockrill described overhearing a male voice shouting angrily in Spanish, which he could not understand. He could also hear the victim grunting, which "was about the only noise she could make." Cockrill claimed that on the next day he told police about the event, which he estimated to have lasted for about five minutes.

Before resting its case, the defense also introduced documents concerning an April 9, 1998, plea of guilt by Marco Villo-Gomez to a charge of assault involving the victim. The warrant completed by the victim provided as follows:

> [The victim] states that on [October 16, 1997] while at her own residence she and [Villo-Gomez] became engaged in an argument when without prov[o]cation [Villo-Gomez] struck [the victim] several times about the arms and chest in a knowing, intentional, and reckless manner. . . .

-8-

The judgment reflected that Villo-Gomez received a sentence of eleven months, twenty-nine days.

In rebuttal, the state put on the testimony of Gladys Horton, the manager of the victim's apartment complex. She testified that after the victim's death, she questioned a number of the tenants, including David Cockrill, none of whom reported having heard anything unusual that evening.

The defense then recalled David Cockrill, who denied having been questioned by Ms. Horton.

Rhonda Gillespie, who characterized the victim as her "best friend," testified as the state's final rebuttal witness. She stated that the victim and Villo-Gomez ended their romantic relationship at the beginning of December 1997, and that she had not seen Villo-Gomez since that time.

*State v. Douglas F. Jordan, Jr.*, No. E2003-02159-CCA-R3-CD, 2005 WL 1182968, at *1-6 (Tenn. Crim. App., at Knoxville, May 17, 2005).

On appeal, the petitioner argued "that the evidence was insufficient, that the trial court committed certain evidentiary errors, that the trial court erred by denying his motion for continuance, and that the sentence was excessive." *Id.* at *1. This court affirmed the judgment of the trial court. *Id.*

*Post-Conviction*

The petitioner filed a *pro se* petition for post-conviction relief on October 3, 2006. The post-conviction court found that the petitioner presented a colorable claim and appointed counsel to represent the petitioner. The petitioner filed his final amended petition for post-conviction relief on March 28, 2008. The post-conviction court held evidentiary hearings on the matter on March 27, April 2, and April 3, 2009, at which the parties presented the following evidence and testimony.

The petitioner introduced, and the court accepted into evidence, documents purporting to be investigative files of the Blount County Sheriff's Department. Exhibit 6 included a Case Memorandum prepared by Detective Scott Carpenter on June 23, 1998, ("June 23 memo") detailing a telephone call from Alicia Holloway, who "advised that she knew who killed Jennifer Byerley." Ms. Holloway reported that she asked a Mexican national named Alfredo, whom she met at the Airport Inn, whether he killed the victim. He told her that he

did and showed her the knife he used to slash her throat. The June 23 memo states that Detective Carpenter went to the Airport Inn, where the clerk directed him to rooms 224 and 225. Detective Carpenter learned that Alfredo stayed in room 225, and upon entering that room, Detective Carpenter took into possession a knife that matched Ms. Holloway's description, which he observed lying on a table.

Exhibit 6 also included a Case Memorandum prepared by Detective Carpenter and dated June 24, 1998 ("June 24 memo"). This June 24 memo related Detective Carpenter's attempts to locate Alicia Holloway. Detective Carpenter contacted the company for which Ms. Holloway reported that she worked, but the company advised him that they did not have an employee named Alicia Holloway. Additionally, Detective Carpenter learned that no Tennessee driver's license had been issued to an Alicia Holloway with the same birth date and address of the Ms. Holloway who called him. He attempted to call the number she provided but only reached a recording that stated a long distance access code was required to complete the call. According to the June 24 memo, Detective Carpenter "concluded that the information provided by Ms. Holloway [was] untrue" based upon his attempts to contact her, "interviews completed same date with foreign nationals named by Holloway, [and] verified proof that the foreign nationals in question were not even located within the borders of the state of Tennessee until more than two months after the death of [the victim.]"

The petitioner introduced a Case Memorandum dated March 13, 1998, prepared by Detective Carpenter ("March 13 memo") as Exhibit 7. The March 13 memo stated that detectives interviewed, through interpreters, foreign nationals residing in the Cerritos West Apartments. This memo listed eighteen names, the second of which was Alfredo Rubio Vaesia. The memo stated that the detectives photographed and fingerprinted the eighteen individuals.

As part of Collective Exhibit 4, the petitioner introduced a statement by Alfredo Rubio Vaesia to Detective Carpenter on June 24, 1998, in which Mr. Vaesia stated that he knew a woman named Alicia. He said that he did not tell her that he killed the victim. He further stated that he did not live in Tennessee in March 1998.

The petitioner introduced a document as Exhibit 9 that post-conviction counsel found in the sheriff's department's investigative files. The document purported to summarize investigative activity from March 17, 1998, through June 23, 1998. The document, as received into evidence, did not bear a header indicating the writer, date of preparation, or case number. The document related that on April 9, 1998, "Deputy Doug Moore [came] to CID. He [had] a stainless steel paring or butcher type knife he recovered from a Teresa Webb on Wheeler [Road]. [The writer took the] item and [gave it] to CST Muncy for processing." The document further stated that on April 15, 1998, the writer "met Teresa

Webb at Wheeler [Road]. She led [the writer] to [the] area where [the] knife was discovered. This [was] near a white shed on the north side of the roadway approximately 3/10 mile [northwest] from [the] crime scene."

James Brooks testified that in 2002, he was the Assistant District Attorney in Blount County assigned to prosecute the case against the petitioner. Mr. Brooks testified that he provided open file discovery for the petitioner's trial counsel. He said that he and trial counsel went to the sheriff's office and "went through the entire investigation file" and "the physical evidence." Mr. Brooks said that he asked investigators to present their handwritten notes, and trial counsel "went through every note that existed in the file in [his] presence." Mr. Brooks stated that he offered to make copies for trial counsel and to investigate anything that trial counsel did not have the resources to investigate. He further stated that he gave trial counsel "everything[,] whether [his] view was that it was exculpatory or not."

On cross-examination, Mr. Brooks testified that trial counsel's "representation in this case was in the top two most effective cases [he had] ever litigated" because they "litigated every aspect of this case."

The petitioner testified that he did not recall that he and trial counsel discussed the inadequacy of the state's investigation as a potential defense. He said that he did not learn of the knife found on Wheeler Road until the post-conviction hearing.

On cross-examination, the petitioner testified that his trial was the first time that he had been before a jury. He had "put total confidence" in trial counsel "to do exactly what he needed to do." The petitioner denied killing the victim. He said that he believed if the state had more thoroughly investigated other suspects, the jury would not have convicted him.

Detective Jim Widener testified that in March 1998, he was a detective in the Criminal Investigations Division ("CID") of the Blount County Sheriff's Department. Detective Widener testified that Detective Scott Carpenter was the lead investigator in this case and that he was second to Detective Carpenter. According to Detective Widener, Detective Carpenter was in charge of maintaining documentation related to the case, including compiling the "murder book." He explained that the murder book was the entire investigative file, which contained lab reports and witness interviews. Detective Widener testified that he did not meet with trial counsel during the discovery process but that Detective Carpenter did. He said that the sheriff's department had an open file policy.

Trial counsel testified that the petitioner retained him in either 2000 or 2001 to represent him after his previous counsel withdrew. Trial counsel had no recollection of law enforcement finding a knife in a field three-tenths of a mile away from the crime scene. He

testified that if the state did not inform him of the knife, then the state violated *Brady*.[1] He further testified that if he knew about the knife, considered it a potential defense, and did not follow up on it, then he made a mistake in his representation of the petitioner. Trial counsel testified that the state did not provide to him any information regarding the knife found in the field.

Regarding whether he asked the sheriff's department to give him a copy of the murder book, trial counsel stated, "No. I was under the understanding that discovery was being provided to me. If the officer has notes, or anything like that, that's a part of general discovery. I shouldn't have to specially ask for that for anyone. That should be automatically given to me." He further testified that he was not familiar with the March 13 case memo. Trial counsel stated that he was concerned, "after having seen [the March 13 case memo] for the first time, [with] what [he] either could, or would have, done with that document in the investigation stage." He agreed that the March 13 case memo would "be relevant if the [s]tate advanced an argument indicating that Alfredo Rubio Vaesia was not in [E]ast Tennessee . . . in March of 1998." He further agreed that the document would be relevant to show that Mr. Vaesia lied to law enforcement in his June 24 statement, in which he stated that he was not in East Tennessee until May 1998 and that he did not know anything about the victim's murder. Trial counsel testified that the state's withholding of the March 13 case memo would be a *Brady* violation and that the information "could have been beneficial." He further stated that the information was material because the "evidence could have been used to maintain, or to find, some possible defense, witness, or otherwise." He also said that he could have cross-examined and impeached Detective Carpenter about the March 13 case memo. Trial counsel testified that his approach to the petitioner's defense "was to show that they had no evidence on [the petitioner] to show that he did anything."

On cross-examination, trial counsel testified that he would have approached the petitioner's defense the same way if he were given the opportunity. He testified that there were several problems with the case: (1) he received the case from another attorney and did not know whether he received all of the documents that attorney had; (2) many of the witnesses were migratory workers whom neither the state nor the defense could locate; and (3) much of the evidence disappeared over time, such as the victim's apartment which was torn down.

---

[1] In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." 373 U.S. at 87.

The state called Detective Widener in its case-in-chief. Detective Widener testified that his files did not indicate that Alfredo Rubio Vaesia was interviewed any time other than June 24, 1998, with the exception of the March 13 memo. Through Detective Widener, the state introduced as evidence the paring knife found by Teresa Webb three-tenths of a mile from the crime scene. Detective Widener testified that crime scene technician Larry Muncy received the knife on April 9, 1998. Detective Widener located the knife in the department's property room in a box labeled with the victim's name and containing other physical evidence associated with the case. Detective Widener testified that no one tested the knife. He said that there was no connection between the knife and the murder scene, and the knife was not the murder weapon because the medical examiner concluded that the murderer strangled the victim.

On cross-examination by the petitioner, Detective Widener testified that the knife was exposed to the elements, so it was unlikely that an investigator would have found fingerprints. He said that he walked alongside the road near where the victim's body was found, and he did not find a knife. He agreed that he did not use a metal detector nor did he conduct a grid search.

Responding to examination by the court, Detective Widener explained that he was not responsible for deciding what would be tested or who would be interviewed because Detective Carpenter was the lead investigator. He agreed that he saw the knife when investigators took it into custody, and he did not see any blood on the knife at that time.

**Analysis**

On appeal, the petitioner presents four issues for our review: (1) whether the state withheld favorable, material evidence; (2) whether the post-conviction court improperly applied a sufficiency of the evidence test to the materiality prong of the *Brady* standard; (3) whether the suppression of evidence violated the petitioner's right to be free from arbitrary and oppressive government action; and (4) alternatively, whether trial counsel provided ineffective assistance.

A. Standard of Review

In a post-conviction proceeding, the petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006). The post-conviction judge's findings of fact on post-conviction hearings are conclusive on appeal unless the evidence preponderates otherwise. *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). This court may not reweigh or reevaluate the evidence, nor substitute its inferences for those drawn by the post-conviction

court. *State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely *de novo* standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

## B. Failure to Disclose Favorable, Material Evidence

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." 373 U.S. at 87; *see also Sample v. State*, 82 S.W.3d 267, 270 (Tenn. 2002). In *United States v. Bagley*, 473 U.S. 667, 676 (1985), the Supreme Court held that both exculpatory and impeachment evidence fall under the *Brady* rule.

The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). However, the state "is not required to disclose information that the defendant already possesses or is able to obtain." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). Nor is the state required to disclose information which is not possessed by or under the control of the prosecution or other governmental agency. *Id.*

Before an accused is entitled to relief under this theory, he must establish several prerequisites: (a) the defendant requested the information, unless the information was obviously exculpatory; (b) the prosecution must have suppressed the evidence; (c) the evidence suppressed must have been favorable to the accused; and (d) the evidence must have been material. *See Johnson*, 38 S.W.3d at 56; *see also Bagley*, 473 U.S. at 674-75; *Brady*, 373 U.S. at 87; *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995).

"Information that is favorable to the accused may consist of evidence that 'could exonerate the accused, corroborate[ ] the accused's position in asserting his innocence, or possess[ ] favorable information that would have enabled defense counsel to conduct further and possibly fruitful investigation regarding the fact that someone other than the appellant killed the victim.'" *Johnson*, 38 S.W.3d at 56 (quoting *Marshall*, 845 S.W.2d at 233). Additionally, favorable evidence includes evidence that "'challenges the credibility of a key prosecution witness.'" *Id.* at 57 (quoting *Commonwealth v. Ellison*, 379 N.E.2d 560, 571 (Mass. 1978)). In *Johnson*, our supreme court cited with approval a Nevada case stating that evidence is favorable under *Brady* if "it provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation, to impeach the credibility of the state's witnesses, or to bolster the defense case against prosecutorial attacks." *Id.* (citing *Mazzan v. Warden, Ely State Prison*, 993 P.2d 25, 37 (Nev. 2000)).

Evidence is considered material only if there is a *reasonable probability* that, had the evidence been disclosed to the defense, the results of the proceeding would have been different. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Edgin*, 902 S.W.2d at 389. In *Kyles*, the United States Supreme Court explained that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." *Kyles*, 514 U.S. at 434. Rather, the question is whether the defendant received a fair trial, "understood as a trial resulting in a verdict worthy of confidence," in the absence of the suppressed evidence. *Id.* In order to prove a *Brady* violation, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435; *see also Strickler v. Greene*, 527 U.S. 263, 289-90 (1999). The Court in *Kyles* urged that the cumulative effect of the suppressed evidence be considered to determine materiality. 514 U.S. at 436. Thus, the materiality of the suppressed evidence must be evaluated within the context of the entire record as to how it impacts the innocence or guilt of the accused.

In this case, the petitioner claims that the state failed to disclose Exhibit 9, the knife, and the March 13 memo, and that the undisclosed evidence was both favorable and material.

*Request.* That the defendant requested the state to disclose any *Brady* evidence is not in question. The prosecutor testified that he had an open file policy and that he provided trial counsel with everything that he had, and trial counsel testified that he understood that the state was to provide him with discovery.

*Suppression.* Regarding whether the state suppressed the items of evidence in question, the post-conviction court did not make an explicit finding. Instead, the court stated that the state apparently did not disclose the documents to trial counsel and added the caveat that the state's witnesses testified that the prosecution had an open file policy. The state now argues that the open file policy discharged the state's obligation to disclose *Brady* evidence. In its brief, the state contends that if trial counsel did not have and was unaware of the evidence in question, "it does not necessarily follow" that the state suppressed the evidence because it made the evidence available to the defendant.

While there is "'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case[,]'" *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995) (quoting *Moore v. Illinois*, 408 U.S. 786, 795 (1972)), in Tennessee, there is not a bright line rule regarding whether the state discharges its obligation under *Brady* when it purports to open its files to the defendant. A panel of this court, when faced with an argument similar to the one made by the state in this case, based its decision that the state did not violate *Brady* on the materiality prong rather than the

suppression prong, concluding that the record was inadequate to determine whether the state withheld the evidence. *See Bates v. State*, 973 S.W.2d 615, 639 (Tenn. Crim. App. 1997). Another panel of this court pointed to the state's open file policy and defense counsel's testimony that he had access to everything in the state's possession when it determined that the defendant did not present any evidence that the state suppressed evidence. *See State v. Stephen Edward Dickey*, C.C.A. No. 1150, Hamilton County, 1990 WL 32738, at *3 (Tenn. Crim. App., at Knoxville, March 27, 1990).

> In *Strickler v. Greene*, the United States Supreme Court, in *dicta*, wrote, We certainly do not criticize the prosecution's use of the open file policy. We recognize that this practice may increase the efficiency and the fairness of the criminal process. We merely note that, if a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*.

527 U.S. at 283, n. 23. The Sixth Circuit has reasoned that the state's withholding of evidence in violation of an open file policy "can obviously cause great prejudice to a defendant." *United States v. Atisha*, 804 F.2d 920, 924 (6th Cir. 1986). The Seventh Circuit, on the other hand, ruled that the government fulfilled its obligation under *Brady* by opening its files to the defendant. *See United States v. Driver*, 798 F.2d 248, 251-52 (7th Cir. 1986). In *Driver*, however, the defendant did not argue that the state failed to disclose certain documents, but instead he argued that the state should have further investigated the documents and given him the information gleaned from the additional investigation. *Id.*

Following the reasoning in *Strickler*, we conclude that the state's open file policy did not discharge its affirmative duty under *Brady* to disclose favorable, material evidence to the defendant. The defendant was entitled to rely on the state's assertion that it provided him with its entire file. Therefore, defense counsel's testimony, as accredited by the post-conviction court, that he was unaware of Exhibit 9, the knife, and the March 13 memo, leads us to the conclusion that the state did not disclose those items of evidence to the defendant. However, the state was only obligated to disclose those items if they were both favorable and material to the defendant.

*Favorability.* The defendant contends that the knife found on Wheeler Road, Exhibit 9 - the document detailing how a citizen found the knife and gave it to police, and the March 13 memo were favorable to his defense. The post-conviction court ruled that the knife and Exhibit 9 were not favorable because the police did not link the knife with the murder. The court ruled that the March 13 memo was favorable because trial counsel could have used the existence of the memo to question the reliability of the state's investigation.

With regard to the March 13 memo, we agree with the post-conviction court. However, we disagree with the post-conviction court's findings as to the knife and Exhibit 9. The post-conviction court found that these items of evidence were not favorable because the police did not link the knife to the victim's murder. After a *de novo* review, we conclude that the favorable aspects are the very facts that the police located a knife near where they found the victim's body and did not further investigate.

In *Branch v. State*, the defendant argued that the state withheld evidence that corroborated his version of the crime. *Branch*, 469 S.W.3d 533, 533 (Tenn. Crim. App. 1969) (*superseded by rule as stated in State v. James*, 315 S.W.3d 440 (Tenn. 2010)). The defendant claimed that he shot the victim because the victim was chasing him while brandishing a knife. *Id.* The state's witnesses testified that they did not see the victim with a knife, but prior to trial, an unnamed citizen found a knife at the crime scene and gave it to the police. *Id.* at 533-34. The prosecutor did not disclose to the defendant that someone had found a knife because he believed the knife was inadmissible due to the fact that the citizen who found the knife did not give his name to the police. *Id.* at 534. A panel of this court ruled that the state violated *Brady* because the knife was favorable, material evidence that supported the defendant's claim of self-defense. The panel reasoned that:

> Considering that the whole defense was self-defense, defense against a pursuing knife-brandishing assailant, the fact that the Assistant District Attorney General had not explored the origin of the knife, or its possible connection with the homicide, and consequently felt that he had no admissible evidence regarding it, could not possibly justify him in withholding and suppressing from the defendant the fact that a knife purportedly found at the scene had been turned in to the police. That information could very well have enabled defense counsel to conduct further and possibly fruitful investigation regarding the finding of the knife. The mere fact that the police did not get the name of the person who delivered the knife to them could not in any way affect the duty of the Assistant District Attorney General to inform the defendant or his counsel of the fact.

*Id.*

In both *Branch* and this case, a citizen found a knife and turned it into the police, who did nothing to investigate the origin of the knife. In this case, the murderer stabbed the victim and slashed the her neck repeatedly after strangling her. A citizen found a knife approximately one month after the victim's murder and three-tenths of a mile away from where the police found the victim's body. As in *Branch*, if the state had disclosed the existence of the knife to the defendant, "[t]hat information could very well have enabled

-17-

defense counsel to conduct further and possibly fruitful investigation regarding . . . the knife." *Id.* That investigation might have led to evidence that exonerated the defendant or implicated another suspect, and the defendant might also have used the fact that the police did not investigate the knife to impugn the quality of the police investigation. Therefore, we conclude that the knife and the document detailing the discovery of the knife were favorable to the defendant.

*Materiality.* Having concluded that the state did not disclose favorable evidence to the defendant, it remains for us to determine whether the evidence was material to the defendant's guilt or innocence. The touchstone of this inquiry is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434. In making this determination, we view the suppressed evidence *cumulatively*, in light of the entire record. *Id.* at 436.

While the sufficiency of the evidence is not the basis for analyzing the materiality of the suppressed evidence, it is helpful in this instance to review this court's opinion on the sufficiency of the convicting evidence from the defendant's direct appeal:

> This question is a close one. There is no direct evidence of guilt. The state was unable to produce the murder weapon. Although there was testimony that bleaching could break down DNA identification, the state stipulated that the victim's blood had not been found near either the defendant's residence or vehicle. Through the testimony of David Cockrill, the defense introduced evidence that the victim had returned to her apartment. Cockrill claimed that at 3:00 a.m., he overheard her engaged in a loud dispute with a male who spoke Spanish. There was ample evidence that the victim socialized primarily with "Mexicans" and that she had previously been the victim of an assault by Marco Villo-Gomez. There was no evidence that the defendant spoke Spanish.
>
> Nevertheless, two witnesses, Mary Roberts and Earl Horton, testified that the defendant was the last person seen with the victim the night of her murder. Horton recalled that when the victim left the End Zone, she walked with the defendant in the direction of his motel residence. On the following day they saw scratches on his face they had not seen before the murder. While the defendant initially denied that the victim had been in his room on the evening of her death, he ultimately admitted that she had been there when he was confronted by police with a note recovered from his trash can. The content of the note indicated that the two disagreed on the nature of their relationship. The defendant acknowledged that he was angry with the victim

because of her persistence in pursuing a relationship. The defendant's blood was found on the tag of the victim's bra and on the front of her overalls. His DNA was found under her fingernails. The testimony of Gladys Horton contradicted the testimony of David Cockrill. Expert testimony suggested that the murderer was right-handed. While the defendant was right-handed, the proof established that Villo-Gomez was left-handed. While under investigation and under the influence of drugs, he made a statement which could have been interpreted as incriminating. Finally, shortly after the murder, the defendant, apparently "sweaty," paid extra in order to have same-day laundry service on bloody sheets. As was its prerogative, the jury, which saw and heard the evidence firsthand, chose to accredit the testimony of the state's witnesses and disregard the conflicting proof. *See State v. Summerall,* 926 S.W.2d 272, 275 (Tenn. Crim. App .1995). In our view, the circumstantial evidence was *marginally sufficient* to support the conviction.

*Douglas F. Jordan, Jr.,* No. E2003-02159-CCA-R3-CD, 2005 WL 1182968, *7 (emphasis added).

When the outcome of a trial is "only weakly supported by the record," the impact of any error is greater than when the outcome has "overwhelming record support." *See Strickland v. Washington*, 466 U.S. 668, 696 (1984). In this case, as shown by this court's opinion from the direct appeal, the evidence was only marginally sufficient to sustain the verdict. Furthermore, the state represented to the jury that the police "did the best they could," indicating that the police investigation was thorough and reliable. The petitioner was unable to present evidence to contradict the state's characterization of the investigation. We have previously concluded that the state withheld evidence that was favorable to the petitioner in that he might have used the evidence to impeach the police investigation. After carefully reviewing the record, "we cannot be reasonably confident that every single member of the jury," after hearing evidence impugning the police investigation, would have found the petitioner guilty because the margin of sufficiency was so slim that *any* favorable evidence would be material. *See Johnson*, 38 S.W.3d at 59. Therefore, our confidence in the outcome of the trial is undermined, and we conclude that the favorable evidence withheld by the state was cumulatively material to the determination of the petitioner's guilt or innocence.

Having found that all four elements of a *Brady* violation are present, we must remand this case to the Blount County Circuit Court for a new trial. *See Johnson*, 38 S.W.3d at 63.

C. Trial Court's Analysis of Materiality Prong

-19-

The petitioner contends that the trial court used a sufficiency of the evidence standard of review in its determination of the materiality prong of the *Brady* analysis. The trial court ruled that the March 13 memo was not material because the fact that the defense might have used the memo to impeach the police investigation did not "rise to the level of putting 'the whole case in such a different light as to undermine the confidence of the verdict[,]'" quoting *Kyles*, 514 U.S. at 434. Nothing in the trial court's order indicates that it used a sufficiency of the evidence standard. Therefore, the petitioner's argument is without merit.

## D. Violation of Freedom from Arbitrary and Oppressive Government Action

The petitioner argues that the state's withholding of evidence violated "the broad and 'audacious' concept of liberty embodied in [Article I, sections 1 and 2 of] Tennessee's Constitution regardless of whether the withholding of evidence rises to a [*Brady*] violation." It is well-settled "that courts do not decide constitutional questions unless resolution is absolutely necessary to determining the issues in the case and adjudicating the rights of the parties." *State v. Taylor*, 70 S.W.3d 717, 720 (Tenn. 2002); *DeLaney v. Thompson*, 982 S.W.2d 857, 858 (Tenn. 1998). Based on our reversal of the judgment in this case, it is not necessary to determine petitioner's larger issue concerning Article I, sections 1 and 2. *See Taylor*, 70 S.W.3d at 720.

## E. Ineffective Assistance of Counsel

The defendant presents an alternative argument that, if the state did not violate *Brady*, then his trial counsel provided ineffective assistance of counsel by failing to discover the evidence suppressed by the state. Because we conclude that the state violated *Brady*, the petitioner's alternative argument that his counsel was ineffective is without merit.

## Conclusion

Based on the foregoing reasons, we reverse the judgment below and remand this case to the Blount County Circuit Court for further proceedings consistent with this opinion.

_____
J.C. McLIN, JUDGE