# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 29, 2013 Session

## CRYSTAL MIRANDA KIRBY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Campbell County**
**No. 14865      E. Shayne Sexton, Judge**

---

**No. E2012-01995-CCA-R3-PC - Filed May 3, 2013**

---

A Campbell County jury found petitioner, Crystal Miranda Kirby, guilty of first degree premeditated murder, second degree murder, and especially aggravated robbery. The trial court sentenced her to an effective life sentence. On direct appeal, this court ordered the merger of the two murder convictions but denied relief in all other respects. Petitioner then filed the instant petition for post-conviction relief, which was denied after an evidentiary hearing. Petitioner appeals the denial of post-conviction relief, claiming that the State violated her due process rights under *Brady v. Maryland* by withholding two video-taped statements that were allegedly exculpatory in nature. After thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

Howard R. Ellis, Oneida, Tennessee, for the appellant, Crystal Miranda Kirby.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Lori Phillips-Jones, District Attorney General; and Michael O. Ripley and Scarlett W. Ellis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

**A. Facts from Trial**

The investigation into this case began on June 3, 2006, when a volunteer with the Stoney Fork Fire Department found the deceased victim, Jonathan Pierce, in his truck. *State v. Crystal Miranda Kirby*, No. E2008-01862-CCA-R3-CD, 2010 WL 1854137, at *1 (Tenn. Crim. App. May 7, 2010), *perm. app. denied* (Tenn. Sept. 22, 2010). The victim appeared to have driven his truck off an embankment. *Id.* Further inquiry revealed that several people had been cooking methamphetamine in a man-made structure near a natural gas or oil source located on Caryville Mountain and had been involved in the victim's death. *Id.* A full recitation of the facts can be found in our opinion on direct appeal. *See id.* at *1-8. However, for purposes of this post-conviction appeal, the following facts are pertinent to our analysis:

At trial, Captain Don Farmer of the Campbell County Sheriff's Department testified that during the investigation of the victim's murder, petitioner gave eight different statements. *Id.* at *2. Petitioner's role in the murder varied with each statement. She gave her first statement on October 20, 2006, in which she claimed that she was not present when the victim was killed but that she learned about it after the fact. *Id.*

Captain Farmer stated that petitioner gave a second statement on October 22, 2006. *Id.* In this statement, petitioner stated that she heard the men say they were going to "put a good beating on [the victim]" a few days before he was killed. *Id.* Petitioner gave a third statement to police on October 30, 2006. *Id.* In this statement, she admitted that she and Sammy Miracle, Tommy Wright, and Lawrence Driver were cooking methamphetamine on Caryville Mountain when the victim unexpectedly pulled into the area in his vehicle. *Id.* She also admitted she was present when the victim was beaten. *Id.* at *2-3.

Petitioner gave a fourth statement on October 31, 2006. *Id.* at *3. In this version, she told police that on the evening of June 2 or 3, 2006, she was at a convenience store in Caryville when she encountered the victim. *Id.* As they were leaving the store, petitioner stated that the victim asked if she needed a ride. *Id.* She called Driver, and he was going to meet her and the victim at a church on Mountain Road to pick her up. *Id.* When Driver did not arrive, petitioner telephoned him, and he asked that the victim drive petitioner to the cook site. *Id.* at *4. When the victim and petitioner drove up to the cook site, Wright "flipped out" because he believed that the victim was a law enforcement officer. *Id.* The victim

-2-

exclaimed that Wright had him confused with someone else, but Wright nonetheless beat the victim then threw him into the bed of the truck. *Id.* at *3-4.

Captain Farmer testified that in petitioner's fifth statement on November 28, 2006, she stated that on June 4, 2006, she was with B.J. Williams and Donnie Jacks when Williams indicated that something had "got[ten] out of hand" after someone walked up on him and Jacks as they were making methamphetamine. *Id.* at *4. In this statement, petitioner denied being on Caryville Mountain when the victim was killed. *Id.*

Captain Farmer stated that the following day, petitioner gave a sixth statement in which she implicated Williams, Miracle, Jacks, and Tim Richardson. *Id.* In this version, petitioner again claimed that she met the victim at a convenience store. *Id.* at *5. She needed to find a ride to Caryville Mountain, and she allegedly had a pre-arranged meeting with Williams at a church on Caryville Mountain. *Id.* When Williams did not arrive as planned, petitioner telephoned him. *Id.* Because he did not want to pack up his equipment, he asked if the victim could drive her to the cook site. *Id.* The victim agreed. *Id.* When they arrived at the cook site, Miracle accused petitioner of bringing "the law." *Id.* She told Captain Farmer that Miracle walked over to the truck, grabbed an object that looked like a club, and struck the victim in the face one time. *Id.* Petitioner recalled that the victim fell to the ground and slouched against the truck. *Id.* She said the victim was gasping for air. *Id.*

Captain Farmer testified that on January 16, 2006, petitioner gave a seventh statement. *Id.* at *6. Petitioner stated that on the night in question, she was with Travis Gaylor and Miracle in Gaylor's car and that she and Miracle were dating at the time. *Id.* She said they stopped to smoke a "joint" and were later joined by Scott Johnson and "Stretch." *Id.* Stretch was waiting for a man he knew from work. *Id.* Shortly thereafter, the victim pulled in beside Stretch's car and talked with Stretch for a while. *Id.* When Stretch left, Miracle accused the victim of being a "narc," and the victim and Miracle began to fight. *Id.* Miracle struck the victim on the head, causing him to collapse. *Id.*

In her eighth and final statement on January 17, 2006, petitioner told Captain Farmer that on the night the victim was killed, she took money from the victim's wallet and gave it to Gaylor. *Id.* at *7. She stated that the victim arrived at the crime scene to pay Stretch some money he owed for the purchase of pills. *Id.* According to petitioner, Miracle asked the victim if he worked for "the law" and further stated that he had observed the victim's truck at a location where someone had been arrested. *Id.* An argument ensued between Miracle and the victim, after which the victim entered his truck. *Id.* Miracle then opened the truck's door and struck the victim until he collapsed. *Id.* Petitioner admitted that "they" disposed of the truck and the victim's body and then returned to the motel to shower and change clothes. *Id.*

## B. Procedural History

Petitioner filed a pro se petition for post-conviction relief raising the issue of ineffective assistance of counsel due to a conflict of interest and failure to file a motion for a change of venue. Appointed counsel filed an amended petition adding a new claim of conflict of interest and a claim that the State withheld exculpatory evidence in violation of *Brady v. Maryland*.[1]

## C. Facts from Post-Conviction Evidentiary Hearing

Petitioner testified that officers video-taped three statements and audio-taped several other statements she made during the investigation of her case. She gave the video-taped statements in September, October, and November of 2006. She stated that the October statement was recorded as she and officers were leaving the county jail and driving over Caryville Mountain. She recalled that law enforcement officers Brandon Elkins, Don Farmer, Richard Foschino, and Steve Vinsant were present on two occasions, and Farmer and Foschino were present the third time.

On cross-examination, petitioner clarified that she, in fact, gave four video-taped statements. She gave the October 2006 statement at the detectives' office. That statement was also audio-taped. She stated that there were two statements recorded in October; the first one was taped at the office, and the second one was recorded on a different date as they left the jail and began to drive over the mountain. When asked, petitioner could not supply any additional information regarding the September or November statements.

Petitioner testified that she informed trial counsel about the multiple video-taped statements. In preparing for trial, counsel reviewed the transcripts of the audio statements with her. She confirmed that she was able to discuss everything about the transcripts that concerned her with trial counsel.

Post-conviction counsel offered into evidence two video-taped statements dated October 20 and October 31, 2006, that were not provided to trial counsel prior to trial. An audiotape of the October 20, 2006 statement[2] was introduced at trial, but the video-taped statement was not made available to trial counsel. Post-conviction counsel claimed that it was exculpatory. The October 31, 2006 video began at a wooded site on Caryville Mountain and recorded petitioner's pointing to various places and explaining her version of the crime.

---

[1] 373 U.S. 83 (1963).

[2] This statement was simultaneously audio-taped and video-taped.

Post-conviction counsel claimed that the statement was exculpatory because law enforcement officers later determined that the crime occurred at a different location. The State admitted that the two video-taped statements in question were not provided to trial counsel but contended that they were not exculpatory in nature.

Petitioner called one of her trial attorneys, hereinafter referred to as pre-trial counsel, as her next witness. At the time of the post-conviction hearing, pre-trial counsel was employed as an assistant district attorney general. Prior to accepting that position, he represented petitioner for eight to ten months. Pre-trial counsel did not recall filing a motion for discovery "but [was] sure that [he] would have."[3] Post-conviction counsel later supplemented the record with a copy of the motion for discovery.

Petitioner's subsequent attorney, hereinafter referred to as trial counsel, represented petitioner at trial. He testified that pre-trial counsel filed a motion for discovery in petitioner's case. He recounted the "crux" of the State's case against petitioner, stating:

> The majority of the State's evidence against [petitioner] was seven recorded statements[4] that [petitioner] made to Detective Farmer and on certain occasions[,] Detective . . . Vinsant. She made statements alleging that various other people were involved in this and then eventually told statements that it involved herself, Sammy Miracle[,] and her half-brother, Travis Gaylor, and these statements probably totaled over – well over an hour, maybe two hours total, I would say, that took up the majority of the time that the State put on their proof.

Trial counsel testified that the recorded statements to which he referred were audio-taped statements and that he never saw any video-taped statements. However, he stated that it would "[n]ot necessarily" have made a difference in the defense if he had seen a video-taped recording because his trial strategy was to attempt to persuade the jury that Sammy Miracle was the primary actor and that petitioner was, "at most, a peripheral player" who was involved in the cover-up of the crime. Trial counsel testified that "unless there was something in those statements that made us take a totally different tact [sic]," he could not be sure he would have changed his strategy. With regard to sentencing, he said that without

---

[3] Pre-trial counsel also testified at length about the procedure utilized by the District Attorney General's Office to "insulate" him from having contact with anyone about the prosecution of his former clients. However, because petitioner abandoned this claim on appeal, we have omitted this testimony from our recitation of the facts.

[4] Petitioner apparently gave seven audio-recorded statements and one written statement.

seeing the video-taped statements, he did not know whether they would have affected petitioner's sentencing.

Trial counsel initially did not recall petitioner's accompanying law enforcement officers to an alleged crime scene. When asked if he was aware of an audio recording of petitioner's statement at the crime scene, he stated, "I have – once it came out that there was a video – an audio recording of her on the mountain, . . . I have some recollection that [petitioner] may have told me that they went up on the mountain."[5] Trial counsel testified that the most difficult part of the defense was "trying to get around seven audio statements of admissions against interest that [petitioner] had provided investigators."

On cross-examination, trial counsel confirmed that the audio-taped statements yielded different versions of petitioner's involvement in the crime. In each version, she would add participants or subtract participants and add to her conduct or lessen her conduct. Trial counsel acknowledged that the transcript of the October 20, 2006 audio-taped statement indicated that the statement was also being video-taped.

The State presented the testimony of Special Agent Steve Vinsant with the Tennessee Bureau of Investigation ("TBI"). Agent Vinsant testified that he assisted with the investigation into the death of Jonathan Pierce and that specifically, he questioned petitioner with regard to her involvement. He identified the videotapes of petitioner's October 20, 2006 statement and October 31, 2006 statement. He confirmed that the latter statement was recorded when petitioner accompanied him to Caryville Mountain. Agent Vinsant testified that he did not provide the videotapes to the District Attorney General's Office prior to trial because he forgot about their existence due to the lapse of time between the dates the statements were taken and the date the case went to trial. He found them a few days prior to the post-conviction evidentiary hearing after the State requested that he review his files and search for the videotapes.

On cross-examination, Agent Vinsant testified that he was not involved with or present for the October 20 statement. He acknowledged that in the October 31 statement, petitioner was very specific in her description of the crime scene. She indicated where various vehicles were located and where she was positioned at the time. She and Detective Don Farmer performed a re-enactment to demonstrate the location of the victim's body. Agent Vinsant stated that through further investigation, they determined that the crime occurred at a different location on the other side of Caryville Mountain. He admitted that

_____

[5] Because the statement at the crime scene was not separately audio-taped, this court infers that trial counsel intended to say "video recording" rather than "audio recording."

petitioner's October 31 statement was not presented to the jury in either video-taped or audio-taped form.

On redirect examination, Agent Vinsant confirmed that they were never able to determine the actual scene where the victim sustained his fatal injuries. They only ascertained where his body was found, and they determined that area to be a secondary scene. He agreed that petitioner's several statements differed in some respects.

The State's next witness was Captain Don Farmer, who was retired from the Campbell County Sheriff's Department. Captain Farmer participated in the investigation into the victim's death. He interviewed petitioner on October 20, 2006. He acknowledged that they made both audio and videotapes of the statement. Captain Farmer recalled that the audiotape was played for the jury, and a transcript of the statement was provided. He indicated that the audio recording of the statement stopped approximately halfway through petitioner's statement, and the transcript reflected that the tape ended.[6] He said that the videotape contained the remaining portion of petitioner's statement and was not played for the jury.

Captain Farmer recalled petitioner's October 31, 2006 video-taped statement on Caryville Mountain and recounted that they reenacted where the victim's body may have been positioned. He also noted that petitioner gave a subsequent statement on the same date at the sheriff's office, which was audio-taped. That statement was played for the jury, and a transcript of it was provided, as well. To his knowledge, the content of both October 31 statements was "the same basically." Captain Farmer acknowledged that petitioner made several other audio-taped statements that were all played for the jury. He was not aware of any other video-taped statements aside from the two in question.

On cross-examination, Captain Farmer denied videotaping petitioner when he arrested her and placed her in his vehicle. Captain Farmer also equivocated with regard to his earlier testimony about the contents of the audio and video-taped statements on October 20, stating that he did not recall whether the audiotape recording ended early. He said that "[t]o the best of [his] memory," both recordings contained the same information. Captain Farmer agreed that on the videotape, petitioner was "constantly in motion with her hand in her hair or rubbing her nose or fidgeting in her chair[.]" He stated that petitioner was "always like that" when he spoke with her. He did not believe that she was under any sort of duress, but he was aware that she had a drug addiction problem. He believed that at the time of the October 20

_____

[6] Although at the evidentiary hearing Captain Farmer equivocated about whether the audio-taped statement stopped prior to the conclusion of the interview, our review of the trial transcript indicates that the tape did, indeed, stop prematurely but that a transcript of the complete statement was entered as an exhibit and provided for the jury.

interview, petitioner had been "off of drugs pretty good. She had been off a while." Captain Farmer recalled that on October 31, 2006, they did not employ an audio recording device when they were on the mountain.

Following the evidentiary hearing, the post-conviction court denied relief by written order dated June 27, 2012. This appeal follows.

## II. Analysis

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2012). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2012). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact are conclusive on appeal unless the preponderance of the evidence is otherwise. *Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App.1997)). However, conclusions of law receive no presumption of correctness on appeal. *Id.* (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)).

On appeal, petitioner advances only one claim: that the State withheld exculpatory evidence, specifically two video-taped statements, in contravention of *Brady v. Maryland*, 373 U.S. 83 (1963).

In *Jordan v. State*, this court summarized the application of *Brady* as follows:

> In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." In *United States v.*

*Bagley*, the Supreme Court held that both exculpatory and impeachment evidence fall under the *Brady* rule.

. . . .

Before an accused is entitled to relief under this theory, he must establish several prerequisites: (a) the defendant requested the information, unless the information was obviously exculpatory; (b) the prosecution must have suppressed the evidence; (c) the evidence suppressed must have been favorable to the accused; and (d) the evidence must have been material.

. . . .

Evidence is considered material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different. In *Kyles*, the United States Supreme Court explained that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." Rather, the question is whether the defendant received a fair trial, "understood as a trial resulting in a verdict worthy of confidence," in the absence of the suppressed evidence. In order to prove a *Brady* violation, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." The Court in *Kyles* urged that the cumulative effect of the suppressed evidence be considered to determine materiality. Thus, the materiality of the suppressed evidence must be evaluated within the context of the entire record as to how it impacts the innocence or guilt of the accused.

*Jordan v. State*, 343 S.W.3d 84, 96-97 (Tenn. Crim. App. 2011) (internal citations omitted).

In ruling on petitioner's *Brady* claim, the post-conviction court did not make any findings of fact. Tennessee Code Annotated section 40-30-111(b) mandates that "[u]pon the final disposition of every petition, the court *shall* enter a final order[ ] and . . . *shall* set forth in the order or a written memorandum of the case all grounds presented[ ] and *shall state the findings of fact and conclusions of law* with regard to each such ground." *See Sykes v. State*, 477 S.W.2d 254, 260 (Tenn. Crim. App. 1971) (emphasis added) (noting the post-conviction court's failure to make findings of fact and conclusions of law in summarily denying relief and "reiterat[ing] and re-emphasiz[ing] . . . the importance and mandatory character of those statutory obligations"); *Brown v. State*, 445 S.W.2d 669, 671 (Tenn. Crim. App. 1969)

(concluding that the general assembly's use of the word "shall" clearly indicated that the post-conviction court's duty to make findings of fact is mandatory). If a trial court does not make oral findings, it should include its findings of fact in an order. *Frank Robert Bigsby v. State*, No. M2002-02260-CCA-R3-PC, 2003 WL 22927139, at *2 (Tenn. Crim. App. Dec. 11, 2003) (*citing State v. Higgins*, 729 S.W.2d 288, 290-91 (Tenn. Crim. App. 1987)). It was error for the post-conviction court to omit making the required findings of fact.

While we emphasize that appellate review of post-conviction cases is "seriously frustrated[,] if not completely thwarted[,]" *Frank Robert Bigsby*, 2003 WL 22927139, at *2 (quotation omitted), by a court's failure to make the requisite findings, given the specific nature of the limited claim advanced on appeal in this particular case, the record is sufficient for us to review petitioner's claims. The sole question for our determination is whether the State's failure to provide the defense with copies of petitioner's video-recorded statements rises to the level of a *Brady* violation. We are not required to review the trial court's weighing of evidence or its findings as to the credibility of the witnesses, which would compel us to consider the post-conviction court's findings of fact. The recordings were made exhibits at the post-conviction hearing and were included in the record on appeal. Thus, our independent examination of the videotapes, together with both the trial transcript and the transcript of the post-conviction evidentiary hearing, are adequate to allow a full appellate review of petitioner's claim.

In denying petitioner relief in this case, the post-conviction court wrote in its order that the State's failure to provide the defense with copies of petitioner's video-recorded statements was improper but did "not rise to the level of a constitutional due process violation." Analyzing the issue according to the four factors listed in *Jordan*, 343 S.W.3d at 96, we first determine that the record clearly indicates that pre-trial counsel filed a motion for discovery. The State's failure to provide the videotapes upon request was error pursuant to Tennessee Rule of Criminal Procedure 16. Secondly, Agent Vinsant admitted that he failed to provide the videotapes to the State, which prevented the State from providing the same to trial counsel, thus establishing that the evidence was withheld. However, with regard to the third and fourth factors set forth in *Jordan*, petitioner has failed to demonstrate that the videotapes were favorable and material.

We first address the October 20, 2006 statement, which was simultaneously video-taped and audio-taped. Petitioner advances two arguments in support of her *Brady* claim. She first asks this court to conclude that the videotape was exculpatory because she exhibited a "fidget[y]" and "disoriented" demeanor that the jury could not observe from merely hearing the audiotape. We do not agree. Our independent review of the videotape does not support petitioner's characterization. Petitioner shifted her body position from time to time, and as counsel stated, she touched her hair repeatedly. However, the statement lasted several

-10-

minutes, and we do not determine that petitioner shifted, "fidgeted," or played with her hair in a manner that would be deemed unusual or extraordinary for a person in jail giving a statement to a police officer. Neither did she appear "disoriented" in the videotape. With respect to this argument, we conclude that the videotape was neither favorable nor material to petitioner's case.

Petitioner's second claim with regard to this videotape is that although the statement was simultaneously audio-taped, the jury did not hear the entire statement because the audio recording stopped before the statement ended. Without making an argument that the remainder of the statement was exculpatory or material, she claims a *Brady* violation because the jury was not presented with her entire statement. The record refutes this contention. The trial transcript reflects that a transcript of the audiotape containing the full statement was provided to the jury. At trial, after the audiotape was played for the jury, Captain Farmer was asked if he could recite what was contained in the remainder of the audiotape. He responded that he would have to refer to the transcript. While the jury did not "hear" her entire statement, it was provided with a transcript of the entire interview. There has been no argument to the contrary, and there is no evidence to contradict the conclusion that the jury had a transcript of the entire audio-taped October 20, 2006 statement. With regard to this claim, we conclude that the evidence was neither favorable nor material to petitioner's case. For the reasons stated herein, no *Brady* violation occurred with regard to this statement.

Petitioner's October 31, 2006 video-taped statement that she gave while on the scene at Caryville Mountain was not simultaneously audio-taped. However, upon return to the police department office, she recounted the statement she made at the scene, and Captain Farmer audio-taped it. The trial transcript reflects that the audiotape was played for the jury, and the jury was given a transcript of the recording.

After comparing petitioner's audio-taped statement that was played for the jury with her video-taped statement given on the mountain, petitioner has failed to direct this court to any discrepancy between the two statements that would support a conclusion that the videotape was in any way exculpatory or material. The basis for her *Brady* claim is that had the jury seen the videotape, it would have "become clear" that the video-taped statement was a false confession. By its very definition, a false confession is not exculpatory. Moreover, evaluating the materiality of the suppressed evidence "within the context of the entire record," *Jordan*, 343 S.W.3d at 97, we conclude that because it was one of a host of false statements given by petitioner, it was not material. In fact, our review of the video-taped statement reveals that it was very similar in substance to the third statement that petitioner gave to Captain Farmer on October 30, 2006. The video-taped statement was not favorable to petitioner in any way. For these reasons, petitioner is not entitled to relief under *Brady v. Maryland* on this claim.

-11-

In sum, petitioner has failed to establish that suppression of the two video-taped statements undermines confidence in the jury's verdict. *Id.* at 100. As such, she is not entitled to relief on this claim.

## CONCLUSION

Based upon the record as a whole, the parties' briefs, argument of counsel, and applicable law, we discern no error and affirm the judgment of the post-conviction court.

_____

ROGER A. PAGE, JUDGE