IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 20, 2017 Session

## STATE OF TENNESSEE v. BRADLEY CRAIG

**Appeal from the Criminal Court for Sullivan County**
**No. S65754        James F. Goodwin, Jr., Judge**

_____

### No. E2017-00257-CCA-R3-CD

_____

The Defendant, Bradley Craig, appeals as of right from his conviction for theft of $500 or less. The Defendant argues that the trial court erred in (1) denying the Defendant's "spoliation motion/objection[,]" (2) ruling that documentary evidence from Walmart.com was inadmissible because it was not authenticated, (3) allowing testimony regarding a store inventory scan concerning the alleged stolen merchandise, (4) denying the Defendant's motion for new trial, and (5) using "stricken evidence" in its reasoning for imposing a sentence of six months' incarceration. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Richard J. Phillips (on appeal), Jonesborough, Tennessee; and Frank Slaughter, Jr., (at trial), Bristol, Tennessee, for the appellant, Bradley Craig.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Joshua D. Parsons, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

FACTUAL BACKGROUND

On February 29, 2016, the Defendant was charged with theft of merchandise of $500 or less by an affidavit of complaint and a criminal summons. See Tenn. Code Ann. § 39-14-103. The Sullivan County General Sessions Court found the Defendant guilty as charged after a bench trial. The Defendant appealed the conviction to the Sullivan County Criminal Court. A jury trial was held on October 18, 2016.

*Jury Trial*

Mark Arnett testified that he was a loss prevention employee at Walmart in Bristol, Tennessee. Mr. Arnett testified that on August 17, 2015, he observed "merchandise on the shelf with the wrappings from a box" in the "housewares" section of Walmart. He explained that there was "a toaster oven" and "packing that goes around" the toaster on the shelf. Mr. Arnett said that he took photographs of these items, and they were entered into evidence as Exhibits 1 and 2, respectively. Mr. Arnett explained that had the toaster oven been a display item, rather than "one that had come out of a box[,]" it "would be mounted and have . . . a plastic piece across the front." Mr. Arnett testified that based on his evaluation, the toaster oven he found was "a stock item" rather than a display item. Mr. Arnett identified Exhibit 2 as "packing from a box[,] . . . the foam and the plastic that surrounds the item to keep it from getting scratched up." He said that he found these packing items "l[]ying more down towards the floor on a lower shelf" in relation to the toaster oven, which "was up higher[.]" Mr. Arnett also said that he did not "see any other . . . open boxes" in that area that would have indicated to him that the packaging had come from a different box.

Mr. Arnett explained that he left the housewares location and went to "[l]awn and garden" where he observed the Defendant and another man, later identified as the Defendant's father, leaving the store. Mr. Arnett said that he observed the Defendant "walking in front of the shopping cart[,]" which contained purchased merchandise, including "a couple of items and a toaster oven[.]" Mr. Arnett testified that after the Defendant left the store, Mr. Arnett obtained surveillance video recordings for the time the Defendant was in the store. He explained that the video recordings were under the control of loss prevention and that store managers were the only individuals who had access to the recordings. Mr. Arnett said that he preserved the video recording and brought it with him. The prosecutor explained that the surveillance video was contained on a disc, which contained "six clips from six different cameras." The disc was entered as Exhibit 3 and played for the jury.

The first video clip was titled "Service Desk 1." Mr. Arnett explained that this camera recorded activity "at the customer service [desk] at the front of the store." Mr. Arnett testified that based on his review of the video, the recording was shot on August 17, 2015, at 10:27 a.m. He further explained that the video showed the Defendant "at the

-2-

[service] desk" wearing a "pair of shorts and a sleeveless shirt and a hat." Mr. Arnett testified that if an individual returns an item to the service desk without a receipt, the person's driver's license is copied and the driver's license number is entered into the system.

The second video clip played was titled "3 Housewares." Mr. Arnett said that this video recording began on August 17, 2015, at 10:51 a.m. in the housewares section of the store. Mr. Arnett stated that this was "the same area where [he] found the two items photographed in Exhibits 1 and 2." Mr. Arnett said that the Defendant was standing in "the area where the toaster ovens [were] located." When asked to describe what he saw happening in the video, Mr. Arnett explained that the Defendant "was taking the toaster oven out of the box and [was] sitting it on the top of the shelf." Mr. Arnett further agreed that "the area where he placed that particular toaster oven, [was] the same location where [Mr. Arnett] found the toaster oven later[.]" Mr. Arnett testified that the video also portrayed the Defendant "putting some items on a lower shelf" in the housewares aisle and that this was in the same area where Mr. Arnett located the packaging materials depicted in Exhibit 2. Mr. Arnett also testified that the video recording portrayed the Defendant's placing the empty toaster oven box in his shopping cart.

The third video clip was played, and Mr. Arnett testified that this video recording began on August 17, 2015, at 10:55 a.m. Mr. Arnett said that the video revealed the Defendant's, accompanied by his father, entering the store's automotive aisle. Mr. Arnett explained that the following items were located in the automotive aisle: "shop rags[,]" "waxes, resin for . . . fibgerglass body," "body shop materials [for] working on cars[,]" "hoses[,]" "cleaning stuff for cars[,]" "floor mats" for a car, and more "stuff like that." The video recording also portrayed the Defendant and his father taking multiple items from the shelves on that aisle and placing the items in their shopping cart.

The fourth video clip played was titled "5 Crafts[,]" and Mr. Arnett said that this video recording began on August 17, 2015, at 11:17 a.m. Mr. Arnett testified that based on his review of the surveillance video recordings, the Defendant and his father went to the fabrics aisle of the store. When asked to describe the Defendant's actions in the fabric aisle, Mr. Arnett said that after "looking left" then "right[,]" the Defendant took "the empty box out and s[at] it down and start[ed] sorting the materials that [were] in the" shopping cart. Then, the Defendant "pick[ed] the box back up and [sat] it back in the" shopping cart. When asked what he believed was happening in this video, Mr. Arnett replied, "[T]he items [were] being pulled from the [shopping cart]" and "prepared to be packed in the box." Mr. Arnett said that the shopping cart blocked part of the view of the box after the Defendant placed it on the floor.

The fifth video clip played was titled "6 Checkout[,]" and Mr. Arnett agreed that the location portrayed in this recording was "the garden center location where [Mr. Arnett] first visually came into contact with [the Defendant] and his father." Mr. Arnett testified that the only items visible in the shopping cart were "[t]he box" and one other item. He agreed that none of the items placed in the shopping cart from the automotive aisle were visible in the cart.

Mr. Arnett testified that after the Defendant and his father left the store and after reviewing the previously described surveillance footage, Mr. Arnett went to housewares and took the photographs that were introduced as Exhibits 1 and 2. Mr. Arnett explained that he also went to the automotive aisle with a "customer service rep" and that they "scanned the items where [Mr. Arnett] had seen the items being taken."

The prosecutor asked Mr. Arnett how the items in the automotive aisle were situated. Mr. Arnett explained that some items "were on shelves" and "some of them [were] on hangers." He agreed that the individual shelves and hangers had a description and price listed on them. Mr. Arnett explained that he was able to determine which merchandise items were missing "based on [his] review of the video, the particular sections based on description and based on [the] listed price where [he] believe[d] the items were missing[.]"

When asked how Walmart maintained inventory of particular items at any given time, Mr. Arnett explained, "[A]ll items have bar codes and . . . you scan the barcode of it[.]" He explained that he scanned items using "a little gun and they scan it and it will tell you what should be there, what it costs and what department." Mr. Arnett agreed that once an item, such as the mop the Defendant purchased, was "scanned and paid for" the system "removes it from inventory." To further explain the system, the prosecutor posed the following hypothetical:

> [I]f I'm understanding what you're saying correctly, if say a car wax kit was purchased or if a particular terry towel was purchased at any register in the store would it automatically remove it from your on hand list [of inventory] in the computer?

Mr. Arnett replied, "It does."

Mr. Arnett confirmed that he was able to "visually identify particular areas where products were missing." He testified that he observed that the following items were missing: "[d]ifferent types of rags, shop rags, fiber rags for polishing, cleaning waxing[,] different kinds of wax[,]" "body material like resin for fiberglass[,]" and "stuff mostly to detail . . . or work on cars." Mr. Arnett testified that the shop rags ranged in price from "$5.00 to $7.00[,]" the terry cloth rags were approximately "$12.00[,]" the wax ranged

-4-

from "$9.00" to "$15.00[,]" the resin kit was approximately "$12.00[,]" and the hoses were "$15.00" or "$16.00[.]" Mr. Arnett testified that he was able to determine through use of scanning items "how many were actually on the shelf versus how many were showing in inventory[.]" Mr. Arnett recalled that there were "between ten and twelve" rags missing, at least one waxing kit missing, approximately three hoses missing, and at least one resin kit missing. Mr. Arnett affirmed that to the best of his knowledge, none of these items were "recovered anywhere else in the store." Moreover, he agreed that he did not recall finding any of the missing items "on a different hook or placed in a different part of the aisle than where they should be" and that none of the missing items were ever recovered.

Mr. Arnett testified that he had received specific training for his "loss prevention job with Walmart." He explained that he "had to train at four different stores and that[ was] . . . approximately . . . 120 hours." Mr. Arnett said that he trained with "more experienced loss prevention officers." When asked if he had "done loss prevention or any other type of investigation with law enforcement . . . prior to this job[,]" Mr. Arnett responded that he had worked "with a private investigator temporarily."

On cross-examination, Mr. Arnett testified that the toaster oven box in the Defendant's cart "appear[ed] to be closed because the box [wa]s upside down." Mr. Arnett agreed that the weekend these events occurred was the same weekend as a race at the Bristol Motor Speedway and that the store "[p]robably was crowded." Furthermore, Mr. Arnett testified that he did not have the toaster oven. He explained that it was sold "for $5.00" at Walmart. Mr. Arnett also testified that he did not have "another comparable box" to the toaster oven box with him. Following these questions, the prosecutor asked the trial court for a jury out hearing, which the trial court granted.

The prosecutor explained that defense counsel was planning to use "a print off . . . from a Walmart website" "regarding a particular toaster oven." Defense counsel said that the printout depicted "the [toaster] oven which matches the receipt for" the box purchased by the Defendant and that he planned to ask Mr. Arnett to identify the box. The prosecutor argued "that what [wa]s in that particular picture that [defense counsel] ha[d] printed off from the website [wa]s not the same as the item that Mr. Arnett testified to earlier and introduced as Exhibit 1."

During the jury out hearing, defense counsel asked Mr. Arnett if the toaster oven in the Walmart print off was "consistent with the toaster oven that was taken out of the box." Mr. Arnett agreed that "[i]t does look like it." Defense counsel also argued as follows:

[Defense counsel]: I have a matter of law I want to take up . . . . Just as far as it relates to a jury instruction, one on spoliation in so much as the toaster

-5-

oven that was supposed to be taken out of the box and put up, it was sold for $5.00 It wasn't kept knowing that this case was going on and so much as to – I mean if they had that toaster oven and on the receipt that they've got it would be one thing if it would match up with this one with what he has so that's the basis for it. That toaster oven was something that tips them off and Walmart decides not to keep it but to sell it for $5.00.

[Trial court]: They took a picture of it.

. . . .

[Trial court]: But in any other shoplifting or theft case I don't know of any cases out there that say[] that the merchandise has to be kept, that the store can't dispose of it. Do you have a case that says that?

[Defense counsel]: Not yet. No, I don't have one.

[Trial court]: At this point I'm going to overrule the motion for that reason[.]

On cross-examination, Mr. Arnett acknowledged that he had never seen the Defendant or the Defendant's father prior to the day of the incident. He testified that he followed the Defendant and his father out of the store but that he did not stop them. Mr. Arnett explained that he followed the Defendant out of the store because he received "a phone call that two individuals were acting shady in automotive and fabrics and [Mr. Arnett] c[a]me out to look for them." Mr. Arnett testified that he believed the two men got into a truck in the store parking lot.

When asked how he determined that the Defendant had stolen $430.00 worth of merchandise, Mr. Arnett explained, "That's what was totaled up by barcodes." Defense counsel asked Mr. Arnett if he "total[ed] those up[,]" and he said, "They were scanned and I was given a printout that had that on it. I was there when they were scanning it but no, I did not physically scan it myself." Mr. Arnett testified that the individual who performed the scanning was not present and that he did not have the list of scanned items totalling $430.00.

On redirect examination, the prosecutor asked Mr. Arnett if he was able "to secure a copy of the receipt" of the Defendant's transaction during which he paid for a toaster oven. Mr. Arnett affirmatively replied and identified the document as the receipt of this transaction, which was marked as Exhibit 4.

On re-cross examination, defense counsel showed Mr. Arnett another document and asked Mr. Arnett if this document contained information "consistent with the toaster oven in question." The prosecutor objected to the introduction of this document, and the following bench conference occurred:

[Prosecutor]: Judge, I believe this is the same scenario as before. This [document] is from the Walmart website.

[Defense counsel]: And it's got that same number that he matched up on the receipt.

[Prosecutor]: It's got [six] digits of the same number from their receipt and he looked at the receipt itself and next to [the] toaster oven there is a long string of numbers that contain more than [six] digits. I submit that the foundation has not been laid by [defense counsel] to say that that means that that toaster oven is what it is.

[Defense counsel]: It is what's consistent just to give the jury some idea what the size and he identified it.

[Trial court]: Well, here's the issue. This is electronic evidence that purports to be from Walmart but there's nothing on here that gives – that tells me that it's where it's from other than things that could be added easily.

[Defense counsel]: Well, he identified it as something that was –

[Trial court]: No, there's no authentication. He's not the webmaster at Walmart.

[Defense counsel]: No, he's the asset guy.

[Trial counsel]: . . . . I find under [Tennessee Rule of Evidence] 901 that there's no authentication for this[,] therefore it's not relevant.

Norm Smith testified that he was working as the "manager of the automotive department" at Walmart in Bristol on August 17, 2015. Mr. Smith identified the Defendant, and testified that on August 17, he observed behavior from the Defendant and his father that "caught [his] attention." Specifically, he said, "There [were] two gentlemen in the automotive department. The buggy was extremely full and there was a . . . large box in the [shopping cart] that was not sealed. It was open." Mr. Smith explained that "immediately after that" he contacted "loss prevention[.]" Mr. Smith

testified that he did not follow the Defendant and his father after they left the automotive aisle. Mr. Smith also explained that he was not able to see into the box but that he saw "items that were in the [shopping cart] along with the box." Those items included: "automotive cloths, terry cloths[, and] wash your car type items." Mr. Smith explained that as the manager of automotive, he was responsible for keeping those items "stocked and in place."

Mr. Smith testified that after he called loss prevention regarding the Defendant's activity in the automotive aisle, he walked to the housewares aisle. Mr. Smith stated, "I went to the counter where the [toaster oven] box is permanently put on the modular and the box, the item was there, the Styrofoam holding it together, the plastic wrap, the instructions. Everything was just tossed on the shelf." The prosecutor showed Mr. Smith Exhibit 1, a photograph previously identified as a toaster oven, and he testified that he observed this particular toaster oven on a shelf in the housewares aisle.

Mr. Smith also testified that at some point while working for Walmart, he had been responsible "for having displays maintained in [his] departments." He affirmed that based on his experience there was a "difference between an item that [was] put up for display and an item that[ was] just . . . removed from a box[.]" When asked to elaborate, he explained that "[a]n item for display is mounted on a Plexiglas display that comes from the corporate office and it's not a live item. It's not a real active item and that's throughout the store." Mr. Smith stated that based on his experience working for Walmart, the toaster oven in Exhibit 1 was "[a] live item."

The prosecutor showed Mr. Smith Exhibit 2, a photograph previously identified as packing material, and Mr. Smith asserted that the items depicted were "[a]bsolutely" the packaging items he saw on the shelf in the housewares aisle that day. When the prosecutor asked if Mr. Smith could tell if the packing material and the toaster oven "were related to one another[,]" he replied, "I could not tell at the time but I would have guessed that they were because there was nothing else disturbed around it."

Mr. Smith also testified that as he walked to the housewares aisle, he noticed that that the Defendant and his father were located in the fabrics aisle with their shopping cart. Mr. Smith said that he did not stop at this point and continued walking to the housewares aisle. Mr. Smith said that after he inspected the housewares aisle, he returned to the fabric aisle where he had previously seen the Defendant and his father. Mr. Smith said that upon inspection, nothing in the fabric aisle appeared "out of place." The prosecutor played a video clip that was previously entered as Exhibit 3D, and Mr. Smith identified it as the same fabric aisle in which he observed the Defendant and his father and later inspected. When asked if he found any of the items that were missing from the automotive department in the fabrics aisle, he responded, "No, I did not."

-8-

Bristol Police Department (BPD) Detective Eric Sergeant testified that he served the Defendant a citation regarding this case on August 19, 2015. Detective Sergeant testified that he met the Defendant and the Defendant's father at "the Dollar General Store . . . on Highway 421" and that he had a conversation with the Defendant. He said that initially, the Defendant denied the allegations of theft. When asked to describe the rest of that conversation, Detective Sergeant said,

> [The Defendant] got out of his vehicle. You could tell he was kind[ of] agitated, asked what this was about and I told him that I had a summons that [I] needed to serve him. I filled out the summons, had him sign it and then g[a]ve him his copy and also had a summons for [the Defendant's father.]
>
> . . . .
>
> I advised [the Defendant] of what it was about, gave him the criminal summons that had the affidavit attached to it. He was reading over it while I was giving [his father] his criminal summons. He was kindl[ of] agitated because of the charges that were placed from Walmart. He was upset and I could tell that. I advised him at that point that there was no need to get upset, that I actually saw the video myself and it does show him on the video what he was doing.
>
> . . . .
>
> [The Defendant's] biggest concern was that there was no way that the things that were being claimed that he took was over $400.00. . . . He asked if there was any way we could just charge him and not . . . his father. I advised him that that was up to the court. It was out of my hands at that point. That was between Walmart and the court system. He then advised that the things that he had were not valued at $400.00; that they were back at [their automotive shop in Bristol] and . . . I told him it was in his best interest to bring those items and return them, to give the property back to Walmart.
>
> . . . .
>
> I advised him that it would be in his best interest to return the items[,] and he said that he would take them back himself. I strongly urged him not to do that given the situation that he had already been charged by Walmart and not to be on the property so I advised him if he would bring the items to me

then I would make sure that Walmart got the items back and return them to Walmart myself.

Detective Sergeant testified that the Defendant never returned those items to him after agreeing to do so. On cross-examination, Detective Sergeant testified that he did not obtain a search warrant for the stolen items because the Defendant had told him that he would return the items to him.

Jerry Craig testified that he was the Defendant's father. He said that he and the Defendant went to Walmart on August 17, 2015. Mr. Craig explained that they went to Walmart to return "seat covers" and "purchase a toaster oven." Mr. Craig testified that he and the Defendant went to the automotive aisle and that the Defendant got "a microfiber mop." He also explained that he

> looked at some other items and put them in the [shopping cart] but [he and the Defendant] talked about it and [the Defendant] later said [they] didn't need them . . . because it was more or less the same thing he was getting in the microfiber mop, which was rags and stuff like that [they] use[d] to clean cars with, so he put them back and [they] left.

Defense counsel showed Mr. Craig a document, which Mr. Craig identified as "a picture I took of the toaster oven that we bought." Mr. Craig testified that he took the picture on August 20, 2015. The photograph was entered into evidence. Defense counsel also showed Mr. Craig Exhibit 4, "the receipt exhibit." Mr. Craig identified the receipt, which included the following two items: "DIPS WASH 075116611124s [$]7.96" and "TOASTER OVEN 068113103738s [$]39.92[.]" Mr. Craig stated, "[T]hat's exactly what we purchased." Defense counsel requested a bench conference, during which he asked the trial court if he could use Mr. Craig to introduce the documents purportedly printed out from the Walmart website. The trial court responded that "somebody . . . from Walmart" would be needed to authenticate the document.

At the conclusion of the trial, the jury found the Defendant guilty as charged.

*Sentencing Hearing*

At the sentencing hearing, the prosecutor presented the following documentation regarding the Defendant: "a superseding indictment and sentencing order, a plea agreement and sentencing order form the U[nited] S[tates] District Court for East Tennessee" regarding theft charges committed on August 14, 2007. These documents, along with medical records detailing the Defendant's poor health, were marked as exhibits. The prosecutor argued that, based on the Defendant's prior criminal conviction, the Defendant "should face the entire exposure of that 11/29 sentence at an appropriate

percentage set by the [c]ourt" and asked that the court order him to pay "the maximum on fines." The prosecutor specifically requested that the Defendant serve "at least 90 days['] incarceration[.]"

Defense counsel argued that the Defendant suffered from multiple mental and physical health problems, which required several medications and "ongoing appointments . . . with . . . doctors." Defense counsel also explained that the Defendant "was gainfully employed" and requested that the court place the Defendant "on alternative sentencing." At the conclusion of the hearing, the trial court ordered a sentence of six months' incarceration. The Defendant filed a timely appeal with this court.

## ANALYSIS

### I. Exculpatory Evidence

The Defendant contends that the trial court erred in denying his "spoliation motion/objection." Specifically, the Defendant argues that the State knowingly failed to preserve the toaster oven, "which Walmart sold." He argues that the toaster oven itself would have provided "specifically more information" than the photograph of the toaster oven, which the State entered into evidence. The State responds that the Defendant waived appellate review of this issue by failing to include it in his motion for new trial. The State further responds that plain error review is not warranted "because the [D]efendant cannot show that the toaster oven was ever in the State's custody." We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution provide every defendant the right to a fair trial. To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963). Further, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. United States v. Agurs, 427 U.S. 97, 110-11 (1976).

In State v. Ferguson, 2 S.W.3d 912, 916 (Tenn. 1999), our state supreme court adopted a test for courts to use in determining whether the State's loss or destruction of evidence deprived a defendant of a fair trial. The first step in analyzing whether a defendant's trial was fundamentally fair "is to determine whether the State had a duty to preserve the evidence." Id. at 917. The State's duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." Id. at 917. This "materiality" standard requires proof that the evidence possesses an exculpatory value apparent prior to the destruction of the evidence and must "be of such a

-11-

nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id.

In California v. Trombetta, 467 U.S. 479, 488-89 (1984), the United States Supreme Court discussed the nature of evidence the State has a duty to preserve:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Id. (footnote and citation omitted).

In State v. Yvette Somerville, No. W2001-00902-CCA-R3-CD, 2002 WL 1482730 (Tenn. Crim. App. Feb. 11, 2002), this court discussed the State's duty to preserve evidence and noted:

> Previously, this court has held that "[t]he prosecution is not required to disclose information that the accused already possesses or is able to obtain." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (citing State v. Caldwell, 656 S.W.2d 894, 897 (Tenn. Crim. App. 1983); Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977)). Additionally, the court held that the prosecution is not required to disclose "information which is not possessed by or under the control of the prosecution or another governmental agency." Id. (citing Banks, 556 S.W.2d at 90). Ultimately, the Marshall court held that the defendant "'must bear the responsibility of [his] failure to seek its discovery'" if the evidence is accessible to both the prosecutor and the defendant. Id. (quoting United States v. McKenzie, 768 F.2d 602, 608 (5th Cir. 1985), cert. denied, 474 U.S. 1086 (1986)).

Id. at *4.

First, we must determine whether the Defendant has waived review of this issue. The entirety of the Defendant's motion for new trial is as follows:

> Comes now Defendant, . . . and moves the [c]ourt to grant him a new trial as the Defendant . . . was limited on adduce proof [sic] in his case in chief and there was a material divergence of testimony of state witness [sic].

-12-

Furthermore, six months['] time incarceration would be better served through the John R. Ray House as it has programs available to help with these types of crime.

Tennessee Rule of Appellate Procedure 3(e) states that

no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e).

Tennessee Rule of Appellate Procedure 3(e) requires that issues presented in the motion for new trial be "specified with reasonable certainty so as to enable appellate courts to ascertain whether the issue was first presented for correction in the trial court." Waters v. Coker, 229 S.W.3d 682, 689 (Tenn. 2007) (citing State v. Gauldin, 737 S.W.2d 795, 798 (Tenn. Crim. App. 1987)); see also State v. Petr Pompa, No. M2016-00193-CCA-R3-CD, 2017 WL 1014529, at *8 (Tenn. Crim. App. Mar. 15, 2017); State v. Mashaal Arradi, No. M2013-00613-CCA-R3-CD, 2014 WL 891536, at *4 (Tenn. Crim. App. Mar. 7, 2014). "[A]ppellate courts should review a motion for new trial in the light most likely to preserve the issue alleged, although courts cannot create an error where none has been legitimately preserved." Fahey v. Eldridge, 46 S.W.3d 138, 146 (Tenn. 2001); Pompa, 2017 WL 1014529, at *8; Arradi, 2014 WL 891536, at *4.

The Tennessee Supreme Court has explained,

Before an issue can be properly preserved in a motion for new trial under Rule 3(e), a well-pleaded motion should (1) allege a sufficient factual basis for the error by setting forth the specific circumstances giving rise to the alleged error; and (2) allege a sufficient legal basis for the error by identifying the trial court's claimed legal basis for its actions and some articulation of why the court erred in taking such actions.

Fahey, 46 S.W.3d at 146.

Here, the Defendant failed to include a factual basis for the error by failing to set forth the specific circumstances giving rise to the alleged error. In addition, the Defendant does not allege a legal basis for the error by identifying the trial court's

-13-

claimed legal basis for its actions nor does he supply any articulation as to why the court erred in taking such actions. The Defendant's motion is a general proposition that the trial court erred and that the Defendant is entitled to a new trial. Thus, the Defendant's issue regarding the preservation of the toaster oven was not properly set forth in the motion for new trial with enough specificity to preserve it for appeal under Rule 3(e). See, e.g., Fahey, 46 S.W.3d at 146 (waiving defendant's suppression issue because motion for new trial did not "assert the legal grounds relied upon by the [trial] court for excluding the expert" or "set forth any legal ground identifying why the court's exclusion was improper"); Arradi, 2014 WL 891536, at *4 (finding waiver where suppression issue failed "to identify any legal ground supporting the conclusion that the admission of the testimony was improper," and "[t]he general statement regarding the 'speculative testimony' provided little guidance to the trial court as to the error alleged, and certainly failed to put the court on notice of claims regarding expert testimony"). Thus, the issue is waived. See Tenn. R. App. P. 3(e).

Our review is limited to one for plain error. See Tenn. R. App. P. 36(b).

A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process. When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

Id.

The doctrine of plain error only applies when all five of the following factors have been established:

(1) the record clearly establishes what occurred in the trial court;

(2) the error breached a clear and unequivocal rule of law;

(3) the error adversely affected a substantial right of the complaining party;

(4) the error was not waived for tactical reasons; and

(5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000)). "An error would have to [be] especially egregious in nature,

-14-

striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006).

The Defendant argues that the toaster oven would have potentially provided exculpatory evidence because it possibly possessed a serial number that could be compared to the serial number of the toaster oven box. The Defendant asserts that the toaster oven was a material piece of evidence because if the serial number on the toaster oven did not match the serial number of the toaster oven box, then the State would not have been able to prove the necessary elements of theft. The Defendant explains,

> [T]he State's theory rests on whether [the Defendant] removed a toaster oven from a box, placed that box in his shopping cart, and filled that box with Walmart's rightful property with an intent to deprive Walmart of said property, the question of whether that particular toaster oven goes with that particular box is material if not dispositive to the State's entire theory of the case.

The Defendant further argues that

> the existence of internet evidence suggesting that the oven does NOT, in fact, go with the box . . . provides us with an even stronger possibility that the oven itself would have provided exculpatory evidence not provided by simply introducing, as the State did in this case, a picture of the oven.

Here, no clear and unequivocal rule of law has been breached. See Smith, 24 S.W.3d at 282. The State never had possession of the toaster oven. Mr. Arnett testified that Walmart sold the toaster oven for $5. Accordingly, the plain error doctrine can afford no relief to the Defendant. See Somerville, 2002 WL 1482730, at *4 (holding that the State had no duty to preserve a surveillance tape that remained in Walmart's control at all times prior to its destruction); see also State v. Montrekus Lamon Tiller, No. W2017-00093-CCA-R3-CD, 2017 WL 4481172, at *4 (Tenn. Crim. App. Oct. 9, 2017) (refusing to conduct plain error review regarding preservation of exculpatory evidence issue "because the State must first obtain the evidence before the State has a duty to preserve it."). As raised, this issue is without merit.

*II. Authentication*

The Defendant argues that the trial court erred in finding that the webpage printout was not properly authenticated. Specifically, the Defendant argues that "the trial court erred under [Tennessee Rule of Evidence] 901 that a screen shot from Walmart's website could only be authenticated by the testimony of a Walmart webmaster and/or a witness from Walmart headquarters." The State responds that the Defendant has waived review

of this issue for failure to include it in his motion for new trial and that plain error relief is not appropriate. We agree with the State.

The admissibility of evidence is governed by Tennessee Rules of Evidence 401 and 403. Under these rules, the trial court must determine, first, whether the evidence is relevant. Tenn. R. Evid. 401. Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Although relevant evidence is generally admissible, see Tennessee Rule of Evidence 402, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence[.]" Tenn. R. Evid. 403.

Tennessee Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Evidence may be authenticated through "[t]estimony that a matter is what it is claimed to be" or "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Tenn. R. Evid. 901(b)(1),(4). Therefore, if the facts and circumstances regarding the evidence "reasonably establish the identity and integrity of the evidence," it should be admitted. State v. Cannon, 254 S.W.3d 287, 296 (Tenn. 2008).

We agree with the State that the Defendant has waived appellate review of this issue for failure to preserve this issue in his motion for new trial. See Tenn. R. App. P. 36(a). In his motion for new trial, the Defendant failed to include specific circumstances regarding authentication or relevancy of the webpages. Furthermore, he failed to specify the court's legal basis for its actions in prohibiting the Defendant from entering the webpages into evidence. Thus, the Defendant has waived review of this issue. See Fahey, 46 S.W.3d at 146.

Again, this court may review issues normally considered waived pursuant to the plain error doctrine. See Tenn. R. App. P. 36(b); Hatcher, 310 S.W.3d at 808. However, we conclude that plain error review is not appropriate. Here, the Defendant has not established that the error affected a substantial right. Both Mr. Arnett and Mr. Smith observed the Defendant's acting suspiciously in the store and testified that multiple merchandise items were missing from the automotive aisle. Furthermore, the Walmart surveillance videos corroborate the Walmart employees' testimony. The videos depict the Defendant's placing a box-less toaster oven on a shelf in the housewares aisle, the Defendant's and his father's loading merchandise from the automotive aisle into their shopping cart, the Defendant's removing an empty box from their shopping cart in the

-16-

fabrics aisle, the Defendant's filling that box with items from their shopping cart, and the Defendant's and his father's leaving the fabrics aisle with only one box and a mop. Moreover, the Defendant admitted to taking items from Walmart to Detective Sergeant and offered to return those items to Walmart. Thus, the Defendant is not entitled to relief regarding his claim that the trial court erred in finding that the webpages were not authenticated nor relevant.

### III. Hearsay

The Defendant argues that the "trial court erred in allowing inadmissible hearsay . . . to unduly taint the jury's findings of facts." Specifically, the Defendant argues that it was error to allow Mr. Arnett to testify regarding "his recollection of results . . . of a data scan that [Mr.] Arnett did not perform." The State responds that the Defendant has waived review of this issue by failing to raise a contemporaneous objection and by failing to include it in his motion for new trial.

We agree with the State that the Defendant has waived appellate review of this issue for failure to preserve this issue in his motion for new trial. See Tenn. R. App. P. 36(a). In his motion for new trial, the Defendant failed to include specific circumstances or any legal basis regarding Mr. Arnett's testimony. Thus, the Defendant has waived review of this issue. See Fahey, 46 S.W.3d at 146.

This court may review issues normally considered waived pursuant to the plain error doctrine. See Tenn. R. App. P. 36(b); Hatcher, 310 S.W.3d at 808. As previously discussed, a substantial right of the Defendant has not been affected, and we conclude that plain error review is not appropriate. The video surveillance recordings of the Defendant strongly support the Defendant's conviction. Thus, the Defendant is entitled to no relief regarding Mr. Arnett's testimony as it related to the scanned Walmart merchandise.

### IV. Motion for New Trial

The Defendant argues that the trial court erred in denying his motion for new trial. First, we consider waiver regarding the Defendant's inadequate briefing of this issue. Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure provides in part that a brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Tenn. R. App. P. 27(a)(7). Rule 10 of this court, which addresses inadequate briefs, provides, in relevant part, that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). In the section of his

brief regarding this issue, the Defendant simply restates the evidentiary issues that he has previously argued. Moreover, he includes no citation to legal authority. Therefore, the Defendant's fourth issue is waived for failing to comply with these rules. See, e.g., Martin Dean Gibbs v. State, No. M2016-00218-CCA-R3-PC, 2016 WL 5944992, at *3 (Tenn. Crim. App. Oct. 13, 2016) (declining to review the petitioner's ineffective assistance of counsel claims due to an inadequate brief), perm. app. denied (Tenn. Feb. 16, 2017). As previously discussed, plain error affords the Defendant no relief because a substantial right has not been affected.

*V. Sentencing*

The Defendant argues that the trial court abused its discretion in relying on "stricken evidence as reasoning regarding ordering [the Defendant] to serve six months in jail." Specifically, the Defendant argues that the trial court "used a combination of . . . stricken evidence and findings not consistent with the record[.]" The Defendant lists the following examples: The "trial judge finding that [the Defendant] was on video taking the oven out of the box"; "[The Defendant] not shown taking any toaster oven out of any box"; and "commentary by [Mr.] Arnett accusing [the Defendant] of taking the toaster oven out of the box although video did not show same[.]" The Defendant further argues that "[t]his reasoning provided by the judge at the sentencing hearing [was] derived from the State's theory that the toaster oven Walmart employees found was removed from its box which was then placed by [the Defendant] into his shopping cart empty, and then filled [with] Walmart's property, scanned falsely as a toaster oven, and taken out the door." The Defendant concludes his argument by asserting that "the internet evidence rejected by the judge . . . refutes the [S]tate's theory of the case, and debunks the evidence used by the judge to impose sentencing, thereby constituting [an] abuse of discretion on the part of the trial judge." The State disagrees with the Defendant's "reading of the record on this point" and argues that the trial court "considered the Walmart security video to characterize the [D]efendant's conduct as egregious and brazen." The State also argues that the "six-month sentence of confinement is appropriate given evidence of the need to deter this Defendant from additional thefts." We agree with the State.

In the ordering the Defendant to serve six months' incarceration, the trial court reasoned as follows:

The [c]ourt is going to consider what's in Exhibit 1, [the Defendant's] prior record, prior felony theft in the United States District Court for the Eastern District of Tennessee. We didn't have a presentence report done because it's not required for misdemeanor sentencing. We have medical records which show his physical condition is not pristine. His prior criminal history, while not extensive, his involvement in one respect,

-18-

that is that it's another theft, and it seems like [the Defendant] has a problem with stealing things. The [c]ourt is of the opinion that because he's been placed through federal supervision with his prior conviction, which was 2008[.]

. . . .

Previous actions, character of the [D]efendant, that's a negative factor based on this theft. And I'm going to tell you, typically I would not even consider the facts of the case, the facts of the offense surrounding the offense in a theft case, but after having sat through the trial and watched – I heard the testimony come in for one and then watched the videos. While I don't have any sympathy or much compassion for Walmart they're in business to make money and they're a huge corporation. But just watching that video this was one of the most egregious thefts from a business that I've ever seen. I mean, just brazen. You walked in. You took the things back to be returned and that's why Walmart knew exactly who he was and what he was wearing because they were able to identify his identification that he had to show, with the clothes he was wearing and then shows him going, taking that toaster out of the box, shows him arriving in the – putting the box back in the buggy, going over to the automotive section and putting all those things in . . . the box, loading the cart up, then going over to the fabric section, taking the box out of the buggy, putting it in the floor and then loading it up. And it was so – it was apparent his father, [Mr.] Craig, was right there in the automotive section with him and there were times in the video that [Mr.] Craig would touch the box. He wasn't trying to move it or just place it necessarily, but he just brushed up against the box and it just moved all over the cart yet Mr. [] Craig testified that he didn't know anything about any theft, that he never saw his son put anything in the box and while they were in that fabric section of Walmart, of course [the Defendant] was very furtive with the way he looked around the corners to make sure nobody was coming before he took the box out of the cart to begin with. Then Mr. [] Craig developed an intense interest in both fabric bolts and what appeared to be a sewing machine sitting on top of the very top of that aisle to the point that he got it down, was looking at it and put it back and was looking around. Now Mr. [] Craig testified under oath that he didn't know what was going on and that he wasn't part of it, that his son didn't steal anything and that they took a toaster oven out of the Walmart on that particular day and the [c]ourt doesn't accredit his testimony at all. I don't believe a word he said. He looked at his son on that video and it's not the clearest video in the world but said he didn't recognize him and didn't

-19-

even recognize him hardly, or at least said he didn't hardly recognize him when he was standing right beside . . . himself on the video. So I find that Mr. [] Craig has zero credibility with his testimony at trial. And the other telling factor was when [the Defendant] went to put the box back in the buggy after he loaded it down with the merchandise it was all he could do to get it lifted back in the box. He struggled. He didn't struggle when it had a toaster oven in it when he was taking the toaster oven out but he mightily struggled to get that box full of automotive cleaning supplies back in his buggy and that was obvious as the nose on your face when you watched that video. The [c]ourt is of the opinion that the 11 month 29 day sentence will be suspended except for 6 months that you'll serve in the county jail.

Tennessee Code Annotated section 40-35-302(b) governs misdemeanor sentencing and requires a trial court to impose a sentence consistent with the purposes and principles of sentencing. Tenn. Code Ann. § 40-35-302(b). Defendants convicted of misdemeanors are not presumed eligible for alternative sentencing, and trial courts are granted considerable discretion and flexibility in misdemeanor sentencing determinations. State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998); see also State v. Combs, 945 S.W.2d 770, 773-74 (Tenn. Crim. App. 1996); State v. Williams, 914 S.W.2d 940, 949 (Tenn. Crim. App. 1995). A defendant convicted of a misdemeanor is not "entitled to the presumption of a minimum sentence." State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994). Furthermore, a trial court is not required to hold a sentencing hearing but must allow the parties the opportunity to address the length and manner of service of the sentence. Tenn. Code Ann. § 40-35-302(a). The trial court is not required to place its specific findings on the record. Troutman, 979 S.W.2d at 273.

The standard of review applied in felony sentences, an abuse of discretion standard with a presumption of reasonableness, has also been applied to misdemeanor sentencing determinations. See, e.g., State v. King, 432 S.W.3d 316, 324 (Tenn. 2014) (citing State v. Bise, 380 S.W.3d 682, 706-07 (Tenn. 2012)); State v. Christopher Dewayne Henson, No. M2013-01285-CCA-R3-CD, 2015 WL 3473468, at *6-7 (Tenn. Crim. App. June 2, 2015); State v. Su Ann Christopher, No. E2012-01090-CCA-R3-CD, 2013 WL 1088341, at *7 (Tenn. Crim. App. Mar. 14, 2013). This standard of review applies equally to a trial court's decision regarding the manner of service of a sentence. State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the

sentence has the burden of establishing that the sentence is erroneous.  Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Here, the trial court actually held a separate sentencing hearing. At that hearing, the trial court considered the Defendant's prior felony theft conviction and the facts of the offense, which the trial court described as "brazen" and "one of the most egregious thefts from a business [it] had ever seen."  The trial court acknowledged that the Defendant did not have a lengthy criminal history but found that the Defendant had "a problem with stealing things."  The trial court also considered the Defendant's medical records and sentenced the Defendant to a within-range sentence of eleven months and twenty-nine days, ordering the Defendant to serve six months in incarceration.  The trial court did not abuse its discretion, and the Defendant is not entitled to relief on this issue.

CONCLUSION

Based upon consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____

D. KELLY THOMAS, JR., JUDGE

-21-